[Civ. No. 570. Fourth Appellate District.—February 19, 1932.]

ETHEL VAN DERHOOF, Respondent, v. GUS · CHAM-BON et al., Appellants.

A. Heber Winder for Appellants.

Alphonse E. Ganahl for Respondent.

LAMBERT, J., *pro tem.*—In this case the plaintiff and respondent brought an action against Gus Chambon and State Farm Mutual Automobile Insurance Company, a corporation, hereinafter referred to as the Insurance Company, defendants and appellants. The action was brought to recover damages for personal injuries sustained by respondent in an automobile collision with appellant Chambon. The action was tried upon the theory that an insurance company has a direct and primary liability to anyone injured by a car driven by the insured. The accident happened at the intersection of Ninth Street and Sheridan Avenue in the city of Corona, California. Sheridan Avenue runs due north and south and is thirty feet wide from curb to curb. Ninth Street runs due east and west and is of the same width. Both streets are paved. The case was tried by the court sitting without a jury and the court gave a judgment for $7,000 in favor of respondent against both defendants. Both defendants appeal.

Appellants urge for reversal of the judgment first, that Chambon, the driver of the car, was not negligent; second, that plaintiff was guilty of contributory negligence; third, that the judgment, in any event should not have been against the insurance carrier; fourth, excessive damages; and fifth, certain errors of law.

The first two points will be considered together. The only witnesses testifying to the facts relating to the collision were the respondent, appellant Chambon and one McCabe. The respondent testified that the collision took place about 2:30 P. M. at the intersection of Ninth Street and Sheridan Avenue in Corona. She was driving a Chevrolet sedan and Chambon a Chrysler sedan. The Chrysler was coming down a slight grade about twenty miles per hour. All corners

of the intersection were occupied with buildings. At this point it was stipulated that at any one of the corners, during the last 100 feet of his approach, a driver does not have a clear and uninterrupted view of such intersection and of the traffic upon all of the highways entering such intersection for a distance of 200 feet back, and that the provisions of section 113, subdivision 2, of the California Vehicle Act in 1927 were applicable; therefore fifteen miles per hour would be the lawful rate of speed through the intersection. The respondent further testified that after passing the last intersection she was traveling about twenty miles per hour and slowed down to about five miles per hour as she approached the intersection where the accident occurred; when she first saw Chambon's car it was possibly 150 feet away; at that time her car was just starting past the curb and that as she passed through the intersection she picked up speed as much as one could after slowing down as she came up to the intersection and that she crossed the intersection at between five and fifteen miles per hour and that she kept her eye on Chambon until she thought she could pass in safety. The evidence also showed that the left front of Chambon's car ran into the left rear side of respondent's sedan. The force of the impact hurled her car around in the northwest corner of the intersection and respondent was thrown out of the car. The left rear wheel of respondent's automobile was smashed or collapsed, the axle sprung, the back end of the car caved in and gasoline tank smashed. The driver of the Chrysler, Chambon, testified in his deposition, admitted at the trial, that at the time of the accident he was driving the Chrysler sedan; that his brakes were in good shape; that he did not see respondent's car until right close to her or about twelve feet away; that he hit her car about the hind wheel and her car spun around and made a half circle; that he was going from twenty to twenty-five miles an hour; that just before he got to the intersection he hit a small rock in the street and that he looked back and to his left twice and on looking to the front the second time saw respondent in front of him just as he was entering the intersection. He felt the jar or impact only slightly and his car was not greatly damaged, the left fender bent, front wheels thrown slightly out of alignment, one headlight lens broken; the collision happened

near or at the center of the intersection; that he did not apply his brakes or swerve his car before the impact; there was nothing to obstruct his line of vision; that he passed the intersection often and was familiar with it; that he did not blow the automobile horn; he told the respondent that he thought it was his fault; he also told Chief of Police Garner that he thought it was his fault. He testified substantially the same on the witness-stand at the trial, and under examination, among other things, he said in response to a question: "Q. Why did you say it was your fault? A'. Because I was not looking at the time. I drove up to the intersection and I thought that would cause—I caused the accident, or something like that. I thought it was my fault because I was not looking at the time I drove up to the intersection." The witness McCabe fixed Chambon's speed at twenty-five to thirty miles per hour as he approached the intersection.

The foregoing is, of course, only a part of the evidence, but sufficient to show that the findings of the court that the negligence of Chambon was the proximate contributing cause of the accident and that respondent was free from contributory negligence are amply supported by the evidence.

Appellants' argument on this branch of the case is addressed to the weight of the evidence and must of necessity be unavailing in this court. The rule governing the court in regard to negligence as a matter of law is clearly laid down in *Wynne* v. *Wright*, 105 Cal. App. 17, at 19 [286 Pac. 1057, 1058], as follows: " ' ' "It is only where no fact is left in doubt, and no deduction or inference other than negligence can be drawn by the jury from the evidence, that the court can say, as a matter of law, that contributory negligence is established. Even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question of negligence, the question is one of fact for the jury." (*Johnson* v. *Southern Pacific R. R. Co.*, 154 Cal. 285 [97 Pac. 520]; *Seller* v. *Market St. Ry. Co.*, 139 Cal. 268 [72 Pac. 1006]; *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 651].) ' "

And "negligence is a question of fact for the jury even when there is no conflict in the evidence if different conclusions can be rationally drawn from the evidence". (*Herbert* v. *Southern Pac. Co.*, 121 Cal. 227, at 229 [53

124

Pac. 651].) Likewise the credibility of witnesses and any inconsistency in their testimony, either as to other witnesses or standing alone, are for the sole determination of the trial court. (*Peterson* v. *Gilbert*, 83 Cal. App. 542, 546 [257 Pac. 140], and *Robinson* v. *Hoalton*, 213 Cal. 370 [2 Pac. (2d) 344] [Aug. 12, 1931].)

▆▆ Appellants argue that respondent had the last clear chance to avoid the accident. This was a matter for the trial court to determine, but certainly there is nothing in the evidence upon which we would be justified in so holding.

Appellants stress the fact that respondent asked Chambon what was the matter with his brakes immediately after the impact. This was a natural question and proves no negligence on her part. Respondent had entered the intersection first, traveling at a lawful rate of speed, and clearly had the right of way. It was the duty of Chambon to keep a lookout or slow down or stop if necessary, to yield the right of way. In *Carroll* v. *Central Gas Co.*, 74 Cal. App. 303, at 309 [240 Pac. 53, 55], the correct rule is quoted as follows: " 'One who is himself not negligent is entitled to rely upon the presumption that others will exercise due care, so that it is not negligence to fail to anticipate danger which can come only from a violation of law or duty upon the part of another. . . . ' "

Furthermore, this inquiry about the brakes must be taken in connection with Chambon's statement that he thought it was his fault because he was not looking. While the statement that it was his fault was his conclusion, the statement that he was not looking was no conclusion. The whole statement was his spontaneous reaction to the situation and we think in this case, quite accurate. Appellants cite the case of *Quatacker* v. *Hutton*, 108 Cal. App. 606 [292 Pac. 140], which was a case somewhat comparable to the instant case, and wherein this court affirmed a judgment in favor of defendant. A complete answer to this argument is that if the trial court in the case at bar had found for the defendants we would likewise be compelled to affirm the judgment.

What we have said disposes of the questions of negligence and contributory negligence adverse to appellants and our only excuse for giving it so much attention is due to appellants' earnestness and fairness in presenting their argument.

It is next contended by appellants that there was a misjoinder of parties defendant and that the judgment should not have been against the Insurance Company. The complaint was in two counts. The first count stated a cause of action for negligence against Gus Chambon, the driver of the car. The second count proceeded upon the theory that the insurance carrier of appellant Chambon was directly and primarily liable to anyone injured by the negligence of Chambon. The defendant Insurance Company demurred to the second count, raising the point that it stated no cause of action and for misjoinder. The demurrer was overruled and on the face of the pleadings, of course, the ruling was proper because the second count alleged that the said Insurance Company undertook and promised that it would pay to person or persons who might be injured through the negligence or carelessness of Gus Chambon in operating his said automobile the amount of damages suffered, not exceeding $10,000. However, the point was properly raised in the case by the objection to the introduction of the policy of insurance on the ground that it did not contain any promise to pay any one of the public who might be injured through the negligence of Chambon. At the close of the trial, judgment as heretofore stated, was given against both defendants. In order to solve the question that has arisen, that is, reason to a logical conclusion, it is necessary to start with a sound premise. Now, unless the policy sued on herein provides by fair construction that it inures to the benefit of anyone that might be injured through the negligence of the insured, Chambon, or there is some statute or ordinance so providing, then the respondent had no right to join the appellant Insurance Company in the suit. And in this connection it may be said that the mere happening of an accident fixes the liability of no one. Where two persons are in the exercise of equal rights and each chargeable with the same degree of care no presumption of negligence arises from the mere happening of an accident. (*Sauer* v. *Eagle· Brewing Co.*, 3 Cal. App. 127 [84 Pac. 425].) The only right the respondent had then upon the happening of the collision was to sue to fix the liability of Chambon, the driver of the car, if she could, and unless the Insurance Company had a direct and primary liability it could not be properly joined with the driver of the car. This requires

in the first instance of course, an examination of the policy. The policy in this case provides among other things:

"State Farm Mutual Automobile Insurance Company hereinafter called the 'Company' does hereby insure Gus Chambon of the city of Arlington, State of California . . .

"Perils insured against.

"Part 1—Fire, Theft and Collision.

"Against actual, direct loss or damage to the body, machinery and equipment of the automobile described herein, while this policy is in force, to an amount not exceeding that specified herein, caused solely by . . . "

Then follows clause A, fire; clause A–1, transportation; clause A–2, tornado, cyclone, etc.; clause B, theft; clause C, collision; part II, property damage and liability;

"Against legal liability imposed upon the assured resulting solely and directly from an accident by reason of the ownership, maintenance or use of the automobile described herein while the policy is in force not exceeding the amount specified in clauses D and E respectively on account of . . .

"Clause E—Liability. Bodily injury and/or death suffered or alleged to have been suffered by any person, other than the assured or those in his household, service or employment, to an amount not exceeding ten thousand ($10,000) dollars for one person and twenty thousand ($20,000) dollars for two or more persons suffering bodily injury and/or death as a result of any one accident.

"The company also agrees without additional premium deposit to render the following service in connection with accidents covered under Clauses D and E.

"To investigate any such accident, upon receiving notice thereof, and to endeavor to make amicable settlement of any resulting claim.

"To defend, in the name of the Assured, any suits which may be brought against the Assured on account of any such accident.

"To pay all expense of litigation on account of suits brought against the Assured by reason of any such accident and all costs taxed against the Assured in any such legal proceeding defended by the Company, together with interest accruing after entry of judgment upon such part thereof as

shall not be in excess of the liability of the Company on account of such accident.

"To furnish such immediate necessary medical and/or surgical aid at the time of the accident as will alleviate suffering or tend to reduce the liability.

"(3) Instructions in case of Property Damage or Liability Accidents. (A) Upon the occurrence of an accident covered by this policy involving injuries to persons or damage to the property of others, the Assured shall give immediate notice thereof by telephone, telegraph, or letter, with the fullest information obtainable at the time, to the office of the Company at Berkeley, California, and to the nearest known agent of the Company. If any claim is made on account of such accident against the Assured, he shall give like notice thereof with full particulars. The Assured shall at all times render to the Company all cooperation and assistance in his power; (B) If suit is brought against the Assured to enforce a claim for damages covered by this policy the Assured shall immediately forward to the Company every summons or other process as soon as served upon the Assured, and the Company will, at its own cost, defend such suit in the name and on behalf of the Assured. The Assured when requested by the Company, shall aid in effecting settlements, securing information and evidence, securing the attendance of witnesses and in prosecuting appeals but the Assured shall not voluntarily assume any liability, settle any claim, interfere in any settlement or legal proceeding, or incur any expense, except at his own cost, without the consent of the Company previously given in writing, except that as respects liability for personal injuries covered under Clause E the Assured may provide at the expense of the Company such immediate medical and/or surgical relief as is imperative at the time of the accident. . . .

"(8) Suits against the Company. No suit action on this policy for the recovery of any claim on account of loss or damage to the automobile described herein, shall be sustainable in any court of law or equity unless the Assured shall have fully complied with all the requirements that relate to such loss or damage, nor until forty (40) days after the same shall become due, nor unless commenced within twelve (12) months next after the happening of the loss; nor shall any action to recover for any loss covered by this policy,

arising or resulting from claims upon the Assured for damages, be sustainable unless it shall be brought by the Assured after the amount of damages for which the Assured is liable, by reason of any casualty covered by this policy, is determined either by a final judgment against the Assured or by agreement between the Assured and the plaintiff with the written consent of the Company, nor unless such action is brought within two (2) years after the rendition of such final judgment; provided, however, that where any such limitations of time are prohibited by the laws of the state wherein this policy is issued, then and in that event no suit or action under this policy shall be sustainable unless commenced within the shortest limitation permitted under the laws of such state.''

It will be seen from an examination of the policy that it insures Gus Chambon and no other person. The name of the person is inserted in the policy and under section 2588 of the Civil Code it can be applied only to his own proper interest. The policy taken as a whole is one plainly of indemnity against liability for loss, and not one of indemnity against mere liability. We have been unable to find any case in California which exactly covers the point. There is a line of cases which distinguish between the liability on an indemnity contract where the insurance is against liability and indemnity against loss. *Gugliemetti v. Graham*, 50 Cal. App. 268 [195 Pac. 64], was a case wherein suit was brought against Graham, the driver of an automobile stage, and the insurance carrier, Western Indemnity Company. The court pointed out the distinction between an agreement in a policy to indemnify against loss and one indemnifying against liability, stating the insurance carrier should not be joined in the former, but held that there was no misjoinder in that case because, while the policy bore the general character of a contract of insurance against loss, it contained this provision: ''This policy will inure to and be for the benefit and protection of anyone who shall sustain any damage or injury or to the heirs, personal representatives, administrators, executors or assigns of any such person who may be so damaged or injured or suffer death by reason of any negligence or misconduct on the part of the driver or operator of the automobile,'' and this case cites *Milliron v. Dittman*, 180 Cal. 443 [181 Pac. 779], which was one of the jitney bus cases.

The same distinction as to the difference between indemnity against loss and liability is pointed out in the case of *Treloar* v. *Keil & Hannon*, 36 Cal. App. 159 [171 Pac. 823]. In *Fraher* v. *Eisenmann*, 94 Cal. App. 48 [270 Pac. 704, 706], which was a case where the insurance carrier was joined along with the insured, it is said: "The policy having been issued pursuant to an ordinance of the city and county (San Francisco) the insurance carrier was properly joined as a party defendant, if the policy itself or the ordinance provided that it should inure to the benefit of the public." (Citing *Gugliemetti* v. *Graham, supra,* and *Malachowski* v. *Varro,* 76 Cal. App. 207 [244 Pac. 936]; also, *Milliron* v. *Dittman, supra.*) *Severens* v. *California etc. Exchange,* 100 Cal. App. 384 [280 Pac. 213], was another of the jitney bus cases wherein it was held that the insurance carrier was properly joined, in view of the ordinance of the city and county of San Francisco requiring every person operating a jitney bus to carry an insurance policy which inured to the benefit of the public, but the plaintiff was denied recovery in the action because the owner of the jitney bus had died, and therefore no judgment could be recovered against him. Consequently no judgment could be recovered against the Insurance Company. While these cases do not exactly solve this question, they do show a continued line of practice which is more or less persuasive. We have been unable to find any case satisfying us that under the policy in this case the Insurance Company was directly and primarily liable, and respondent has not referred us to any so holding.

The first case he cites in support of the judgment is *Bachman* v. *Independence Indem. Co.,* 112 Cal. App. 465 [297 Pac. 110, 298 Pac. 57]. This case is of no aid to the respondent. It was merely a case where Bachman had recovered a judgment against the person whose negligence caused the accident and then sued his insurance carrier, and the case merely holds that in accordance with the statutes of California (Stats. 1919, p. 776), the plaintiff having obtained his judgment against the insured has a right to a judgment against the insurance carrier. In fact, inferentially, the case is in favor of appellants' contention. In a companion case, *Bachman* v. *Independence Indem. Co.,* reported in 214 Cal. 529 [6 Pac. (2d) 943, 944] (Dec. 29, 1931), the Supreme Court said: "The law permits the party who re-

covered this judgment to sue the insurance company (Stats. 1919, p. 776, chap. 367)."

The next case cited by respondent is *Hynding* v. *Home Acc. Ins. Co.* This case is reported in 214 Cal. 743 [7 Pac. (2d) 999] (Jan 30, 1932). This case holds that the fact that a person insured against liability resulting from the operation of an automobile violates the provision of the policy requiring the assured to assist the insurance company in securing information, evidence, the attendance of witnesses, and in effecting settlements and in prosecuting appeals is a valid defense to an action against the insurance company by the injured party, who has secured a judgment against the assured. In this case the court reaffirmed the doctrine laid down in *Malmgren* v. *Southwestern Automobile Ins. Co.*, 201 Cal. 29 [255 Pac. 512], that the statute creates a contractual relation in every indemnity insurance policy which inures to the benefit of any person who might be negligently injured by the assured. Then what was actually held in that case was that when a person had complied with the statute of 1919, *supra,* and obtained a judgment against the assured who was negligent, that he had a right to sue the insurance carrier and that the requirements of the statute could not be defeated by some requirement in the policy contrary to the statute or not provided for by the statute. But in the Hynding case, *supra,* the Supreme Court again says at page 201: "Our statute regulates to a certain defined extent private policies of indemnity insurance. It deprives the insurance carrier of the defense of insolvency or bankruptcy of the assured and it permits an action to be brought by the injured party on the policy *after judgment against the assured* (italics ours), but the action is 'subject to its terms and limitations'. The object of the statute, similar to that of most of the other acts, was to reach a particular evil and not to make this private voluntary contract serve the purpose of compulsory insurance." In 31 C. J., at 457, it is said:

"The rules which govern who may sue on contracts generally control, in so far as applicable, in determining who may or who may not sue on a contract of indemnity. As a general rule the only party entitled to sue on such a contract is the indemnitee or someone in his right, such as his assignee. A third person, although he may have an interest

in the subject matter of the indemnity, and a right of action against the indemnitee, not being a party to the indemnity contract, is not entitled to sue thereon in his own name, unless the contract or bond is not merely for indemnity but also creates a direct obligation in his favor, as where it is conditioned for the benefit of any person 'who may be injured', etc., a person injured may sue on the contract.''

■ A proper construction of the policy in this case convinces us that it insures Chambon and it does not insure the plaintiff. Until the final judgment is obtained Chambon has no legal liability and has suffered no loss. The contract is personal between Chambon and the Insurance Company, subject, of course, to the provisions contained in the laws and statutes of the state of California. It is intended as an indemnity against loss. It is true in order to cover all possible loss it agrees to make investigation, endeavor to settle claims, defend any suits, pay expenses of litigation. Nowhere in the policy is there any express contract of direct liability to third persons. ■ An intent to make an obligation inure to the benefit of a third party must clearly appear in the contract and if there is any doubt about it, it should be construed against such intent (*Wilson* v. *Shea,* 29 Cal. App. 788, at 790 [157 Pac. 543]). Throughout the policy Chambon is insured against loss and this question of loss cannot arise until it has been established by a final judgment. In all the cases in California that we have been able to find which permit the joining of the Insurance Company, there was an express provision in the policy or an ordinance under which it was written providing that the policy should inure to the benefit of the public. It is admitted, of course, that there is no such ordinance involved in this case and that there are no such words in the policy. Respondent cites to us sections 379a and 379b, recently adopted amendments to the Code of Civil Procedure. These amendments relate to practice and procedure, but do not and could not profess to give a right of action against a person where one does not in fact exist. Because the insurance carrier, under the provisions of its policy, appeared and defended the action would not make the insurance carrier a proper party or estop it to so contend.

■ The gist of this whole case is that the respondent asks us to read into the policy words that are not there.

This we may not do. It is the duty of the court to construe contracts in accordance with the law as it exists. If a change should be made in the law this is a matter for the legislature, but it is not for the courts to place a strained and unnatural construction on a document to suit the seeming need of some isolated case.

From what has been said it follows that findings 6 and 7 of the trial court, upon which rests the judgment against the Insurance Company, and incidentally they are conclusions of law more than they are findings of fact, are not supported by either the evidence or the law. This conclusion which we have reached, of course, makes it unnecessary for us to discuss the errors of law assigned by appellants, as they all have to do with admission of evidence relating to the insurance policy except one (exception No. 7), which was of no importance.

▉ Appellants' next contention is that the damages awarded by the trial court are excessive. This matter was raised on motion for a new trial and is properly before this court for consideration. While it must of necessity be a very rare case in which an appellate court can with propriety disturb the judgment of a trial court on the question of the amount of damages, we think this is such a case. As to her injuries, respondent testified:

"I was dazed and bleeding over my face and legs. My face was cut on the right side fairly well up, and my nose was bleeding from inside. Chambon took me to my home about ten blocks away. My little boy was there. Chambon left me and got my husband, who called Dr. Shank. Chambon told me two weeks later, in presence of no one, that, as he was coming down the street, he heard a sound as if he had hit a pebble and the air was leaving his tire; that he looked back at his rear left tire and did not see me until he was right onto my car. My head was cut; nose hurt internally; breast hurt; shoulder scraped and scratched with a large area of skin scratched off; my back the same way; scratches and cuts on lower back; and knees cut, scraped and bruised. My nose still bleeds. The wound under my left knee is hardest to heal up as far as the skin is concerned and gives me trouble. It is bruised and the cut bothers me a great deal. The cut still shows. My nose bothered me a great deal at first; don't bother me so much

except constant bleeding. My breast bothered me a great deal and was very painful. My left knee hurts me constantly yet. It aches. The nervous shock affected my sleep. I don't sleep hardly enough to get by. I take medicine to sleep. Before the accident I wasn't particularly nervous. I was confined to my home for four or five weeks, most of that time in bed. Before I did my housework without help; afterwards, I had help for four or five weeks. I had no nurse but my mother came and stayed with me, besides the girl who did the housework. Dr. Shank treated me about three weeks; since then I have been back for several visits. There was a bruise on back of my leg, with a long cut down the leg, then across my ankle and a deep cut below my knee which Dr. Shank reopened and sewed up again three weeks after the accident. The accident removed pleasure in driving my car as it makes me nervous. I am afraid to drive or to ride with anyone else. . . . ''

Dr. Shank, who treated respondent, testified as follows: ''I was called to attend plaintiff at her home on June 24, 1929, and found her in a state of excitement with numerous bruises, abrasions, lacerations of her body, her scalp; a small, slight laceration of the nose, from which she was bleeding; contusion or abrasion of right shoulder; contusion of lower part of back across hips; both elbows bruised and bleeding; skin laceration below left knee; and numerous other small abrasions. From June 24th to July 16th, I applied antiseptic dressings. I attended her at her home on June 24th and 25th and July 1st, 20th and 24th. She came to my office on July 12th, 13th, 15th and 16th. Most abrasions healed up very well, except the laceration on left knee which was three and a half to four inches long. There granulation tissue set in and would not heal over so I cut it out on July 16th and put in six sutures. She made an uneventful recovery as far as that wound was concerned in a week or ten days. I saw it six months ago; it was healed over, though she was complaining of that knee. I examined it and I told her then that possibly the pain might be due to a nerve being caught in the scar, or possibly there might be a deeper injury to the bone and that only an X-ray could tell. I have not seen the knee since.

''Upon examination now in open court, I find two scars, one below the knee cap and one on side of leg two and a

half inches long. The second scar is slight with apparently no adhesions; this I did not suture, but treated it with antiseptic ointments. The scar below the knee cap where the six sutures were inserted is an inch and a quarter long by three-eighths of an inch wide. The scar below the knee cap is an inch and a quarter long by three-eighths inch wide. I sewed it up after cutting out the 'proud flesh'. There might possibly be a bone injury there, though it cannot be determined by local examination. It would have to be determined by X-ray. From the present examination I would say that there was no bone injury of any consequence for if there was she would have more trouble. It would have been broken down in suppuration or something would have come up by this time, in a year now. An ache now may be due to a nerve caught in that scar. If the nerve is caught in the scar, the condition will not improve unless that nerve is freed.

"I don't remember that I found any broken glass in any of these cuts. If there were, there were only very small fragments. Of course, all the wounds were soiled, but I don't recall that I did definitely find any small splinters of glass. I have seen her once since July 24, 1929, it being when she consulted me about the pain six months ago, about Christmas, 1929. I have never treated Mrs. Van Derhoof for any injuries other than those which I have mentioned. All the treatment I gave her occurred from and after the 24th of June, 1929. I have not found any cause for any of these injuries other than the causes which I found on the 24th day of June, 1929."

Two other witnesses testified as to respondent's being in distress on an occasion of her attending a card party a few days after the accident.

The power of an appellate court to disturb the verdict of a jury or judgment of a court on account of excessive damages has been stated and reiterated many times. The rule is clearly stated in *Darling* v. *Pacific Elec. Ry. Co.*, 197 Cal. 702, at 715 [242 Pac. 703, 709], as follows: "Courts have repeatedly refrained from attempting to establish any precise rule for the measurement of damages in actions for personal injuries but, rather from necessity, leave the measurement to the sound sense and fair judgment of the jury. A verdict, therefore, 'will not be disturbed because

excessive "unless the amount of damages is obviously so disproportionate to the injury proved as to justify the conclusion that the verdict is not the result of the cool and dispassionate discretion of the jury" '. (*Morgan* v. *Southern Pac. Co.*, 95 Cal. 501 [30 Pac. 601] ; *Aldrich* v. *Palmer*, 24 Cal. 513; *Rystinki* v. *Central Cal. T. Co.*, 175 Cal. 336 [165 Pac. 952] ; *Redfield* v. *Oakland C. S. Ry.*, 110 Cal. 277, 286 [42 Pac. 822, 1063] ; *Meek* v. *Pacific Elec. Co.*, 175 Cal. 53 [164 Pac. 1117] ; *Bisinger* v. *Sacramento Lodge No. 6, B. P. O. E.*, 187 Cal. 578 [203 Pac. 768].)''

And in *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.*, 156 Cal. 273, at 277 [104 Pac. 312, 314] : " 'Their verdict . . . will never be disturbed unless the amount of the damages is obviously so disproportionate to the injury proved as to justify the conclusion that the verdict is not the result of the cool and dispassionate consideration of the jury.' (*Aldrich* v. *Palmer*, 24 Cal. 513; *Morgan* v. *Southern Pac. Co.*, 95 Cal. 501 [30 Pac. 601] ; *Lee* v. *Southern Pac. Co.*, 101 Cal. 118 [35 Pac. 572] ; *Howland* v. *Oakland C. S. R. Co.*, 110 Cal. 513 [42 Pac. 983] ; *Clare* v. *Sacramento Elec. etc. Co.*, 122 Cal. 504 [55 Pac. 326, 328].) In considering an attack upon a verdict as excessive, the appellate court must treat every conflict in the evidence as resolved in favor of the respondent, and must give to him the benefit of every inference that can reasonably be drawn in support of his claim.''

■■ All the cases are to the same effect. In other words, unless the verdict or judgment is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise a strong presumption that it is based on prejudice and passion rather than sober judgment, we may not disturb it. But looking at this award of $7,000 in the light of the rule, we cannot give our approval to it. It is obviously so disproportionate to the injuries shown by the evidence as to shock the conscience of an impartial observer.

Respondent argues that before a verdict of a jury on a judgment of a court may be set aside some actual prejudice or passion must be shown to have actuated the court or the jury. Of course this is not the law within the meaning of the statute. In *Doolin* v. *Omnibus Cable Co.*, 125 Cal. 141, at 144 [57 Pac. 774, 775], it is said: "To say that a

verdict for damages was enhanced by passion or prejudice is one mode of saying that the evidence did not justify it; and the only means of discovering therein the element of passion or prejudice, within the meaning of the statute, is by comparing the amount with the evidence which was before the court at the trial. (*Harrison* v. *Sutter Street Ry. Co.*, 116 Cal. 156 [47 Pac. 1019].)'' It is to be noted in connection with the treatment of respondent that her total medical bill was $30. It is significant that from the date of injury to the day of trial respondent's visits to her doctor were as follows: Two visits; then after five days one visit; then after ten days, four office calls; after three days one call; after three days one call; after five months' lapse one call; then for six months no call to the time of trial; only one call on a doctor during eleven months pending the trial. The evidence shows no permanent injury; no permanent scars marring her beauty; no loss of earning power. It seems to us there ought to be some substantial objective symptoms to support such a substantial award. While we have the power to reduce the verdict or judgment in a proper case we feel that the ends of justice will best be served by remanding the case to the lower court for trial on the one issue of the amount of damages. It can then be determined whether there is any bone injury to the knee or any nerve injury in the knee, and a suitable award made. Damages can only be given for an injury actually sustained and for the results that are reasonably certain to follow.

In conformity to what has been said in this opinion it is ordered that the judgment against the State Farm Mutual Automobile Insurance Company be reversed and the court directed to dismiss the second cause of action without prejudice to a suit against the Insurance Company when the plaintiff shall have obtained final judgment against the defendant Chambon. The judgment against appellant Chambon is reversed as to the amount of damages only and remanded to the trial court for a new trial on the sole issue of the damages, the court to take further evidence and make findings on that one issue and then enter judgment against the defendant Chambon for the amount found. In all other respects the judgment as to Chambon is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 18, 1932, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 18, 1932.

Seawell, J., dissented.