[Civ. No. 13855. First Dist., Div. One. Dec. 10, 1948.]

SALLY BLANCHE BUSWELL et al., Respondents, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

John J. O'Toole, City Attorney, Edmond P. Bergerot and Geo. E. Baglin, Deputy City Attorneys, for Appellant.

Ingemar E. Hoberg and Hoberg & Finger for Respondents.

BRAY, J.—Appeal by defendant city and county of San Francisco[1] from a judgment after a jury verdict in a personal injury action in favor of plaintiffs in the sum of $14,000. A motion for a new trial was denied. Liability is not denied. Two points are urged: (1) that the verdict is excessive; and (2) that the instructions on damages were erroneous.[2]

Only a brief summary of the facts of the accident is necessary. On July 10, 1946, plaintiff was returning to Market Street in San Francisco from Fisherman's Wharf on a Powell Street cable car owned and operated by the defendant city and county. As the car was travelling uphill on Mason Street, the grip struck the end of a slot rail which had come loose and partially closed up the slot. The car came to a sudden jolting stop which shattered the windows. The gripman was thrown to the floor, leaving no one at the controls. Mason Street at that point has a 17.45 per cent grade. The car started rolling back down hill at about 8 or 9 miles an hour and everyone started jumping off. Plaintiff was sitting on one of the outside sections, and was the last to jump, landing on her head and left shoulder.

Before considering the extent of plaintiff's injuries, it is advisable to refer briefly to the principles of law invoked in an appeal upon the ground of excessive damages. As said in *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176, at page 187 [195 P.2d 427] : "An allowance of damages is primarily a factual matter (*Crane* v. *Smith*, 23 Cal.2d 288 [144 P.2d 356]), and it is well settled that even though the award may seem large to a reviewing court, it will not interfere unless the allowance is so grossly disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion and prejudice. (*Johnston* v. *Long*, 30 Cal.2d 54, 76 [181 P.2d 645].)'' ''The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court

---

[1] The judgment was also against the gripman and conductor of the cable car involved. They did not appeal.

[2] Plaintiff Sally Buswell sued for damages for the injuries claimed to have been received by her, and her husband sued for loss of her services. Plaintiff, as used herein, will refer to Sally Buswell, unless otherwise stated.

on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented it becomes his duty to reduce them. (*Fisher* v. *Zimmerman,* 23 Cal.App.2d 696 [73 P.2d 1243]; *Sassano* v. *Roullard,* 27 Cal.App.2d 372 [81 P.2d 213].) When the question is raised his denial of a motion for new trial is an indication that he approves the amount of the award. An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors.'' (*Holmes* v. *Southern Cal. Edison Co.,* 78 Cal.App.2d 43, 51-2 [177 P.2d 32].) ''It is not a question of what damages this court would award or whether we consider them high, but whether this court can say that the damages are so excessive as to suggest passion or prejudice.'' (*Nason* v. *Leth-Nissen,* 82 Cal.App.2d 70, 73 [185 P.2d 880.].)

The test has been said to be a comparison of the amount of the verdict with the evidence before the trial court. (*Gackstetter* v. *Market St. Ry. Co.,* 10 Cal.App.2d 713, 724 [52 P.2d 998].) In *Hallinan* v. *Prindle,* 17 Cal.App.2d 656 [62 P.2d 1075], the court stated that the best criterion of the reasonableness of a verdict is its conformity to the average amount awarded by juries in cases where there were injuries of like nature and extent. However, the effect of this criterion has been materially lessened by the holding in the Kircher case, *supra,* page 208: ''It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [citing cases], and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered.''

The evidence as to the injuries follows: The trial was held approximately a year and a half after the accident. Plaintiff testified that when she fell she was temporarily dazed, and that things started to go black. Her forehead was bleeding and blood was running into her eyes. She was taken by ambulance to the emergency hospital, and after about an hour and a half was taken to Mary's Help Hospital, where she remained

from the 10th to the 24th of July, cared for by Dr. Dignan, employed by the Municipal Railway for that purpose. She suffered a dislocated left shoulder and at the cavity in which the head of the humerus rotates there was a small chip fracture of the tuberosity. The chip was about the size of a quarter. She had a contusion over her left eye which did not require stitches, a black eye, and an abrased contusion of the right knee.

Under anaesthetic the head of the humerus was replaced, and her shoulder and arm strapped. There was a very satisfactory reduction. X-rays failed to show any fracture of the skull. Upon her release from the hospital she had trouble with the bandage, which was loose and irritating. Two days later she reported to Dr. Dignan's assistant, who told her it was not necessary to change the bandage, but to report the next week to Dr. Dignan, who was then away. An odor developed from the bandaged area. As she was not able to stand the soreness any longer, plaintiff's husband took her to Letterman Hospital, where she was entitled to service, as her husband is a sergeant in the U. S. Army. There Dr. Luckey attended her, and ordered immediate re-bandaging, as there was a mass of open, festering sores all over her arm. At that time she was extremely nervous, and was unable to lift the left arm and shoulder, due to a paralysis of the axillary nerve.

Dr. Luckey placed her arm in an airplane splint, which she wore approximately four months. Plaintiff reported daily five days a week for four months to Letterman Hospital for extensive physiotherapy, heat and massage, and twice a week for one month thereafter. Until the first part of 1947 her arm was practically useless. Her arm had shriveled to about half its normal size. In the first part of 1947 she gradually started doing her household work, including the laundry, which she had been unable to do before. For about six months before the trial, which was held January 19, 1948, she had been doing all of the work. Since the accident, she has not been able to rest more than 10 or 15 minutes on her left side. Her arm and shoulder are still sore and at night when she turns on them she immediately has to turn to the other side. She had occasional headaches before the accident, but since has headaches frequently, as often as once or twice a week. She cannot keep her arm raised very long to fix her hair. From July to December, 1946, she could not cook meals and she and her husband had to eat at restaurants. The last

time she visited Dr. Luckey was September 27, 1947. She was partially ambulatory in the second week at Mary's Help Hospital, and fully so thereafter. Dr. Luckey testified that at the time of trial the axillary nerve had a complete restoration of functioning, although there is still a "little weakness" in the muscle, but that she should not end up with any residual weakness. She still complains of pain in her arm and has tenderness over the front of the shoulder joint due to a tenosynovitis of the long head biceps. This could be treated by novocaine injections, or X-ray treatments. Some individuals do not respond to this treatment and it becomes necessary to cut the tendon out of the groove and transplant it to adjacent tissue—a major operation. He felt the condition could be cured with intensive treatment. When he first saw her in July, 1946, she was extremely nervous, remaining so for some months. She complains of severe headaches over the left eye, where there was a marked scar which is still visible. She has tenderness at the point of exit of the nerve that supplies that area, and some diminution of sensation. She has a neuritis of the nerve in the supraorbital area, which causes severe headaches. She complains the headaches are as bad or worse than they were a year ago. Dr. Luckey testified, "I feel that they are reasonably permanent." The shoulder joint is subject to recurrent dislocations from mild to moderate trauma.

Plaintiff had performed secretarial and other work before the accident, although not employed at the time of it. In October, 1947, she was employed as a stenographer at $50 per week. She quit after three days, as her arm was too weak to type all day.

Plaintiff husband testified that since the accident she is nervous, argumentative and disagreeable, and that at least once a week he has to bring her ice packs, aspirin and water and that her constant restlessness at night disturbs his sleep.

While there is evidence to the contrary, the evidence favorable to plaintiff (which the jury believed) establishes that in addition to the dislocated shoulder, the chip fracture of the tuberosity, the conditions which required treatment for five months after going to Letterman, there were two residual conditions at the time of trial: (1) the tenosynovitis of the long head biceps; (2) her nervous condition and headaches. The former may yield to further treatment with the possibility of operative procedure being necessary. The latter is

reasonably permanent. Plaintiff was unable to work for the year and a half preceding the trial, and it is reasonable to infer from the testimony that it will still be some time before she can work, assuming the cure of her arm condition and that her headaches will permit her to work. Included in the award was the sum of $426.17 out-of-pocket expense due to the accident.

Taking together everything shown by the evidence, including loss of services by the husband, and in view of the depressed value of the dollar today, we cannot say that the verdict is so excessive as to indicate passion or prejudice on the part of the jury.

While it is true that most of plaintiff's present complaints are subjective, and that defendant's doctor testified that in his opinion plaintiff had fully recovered from the accident, those are matters primarily for the jury. We cannot say, as a matter of law, that plaintiff is not suffering as she and Dr. Luckey say she is. Likewise, whether her testimony at her deposition, as explained by her at the trial, was contradictory of her then testimony, and the extent of her headaches before and after the accident, were matters for the jury.

Defendant contends that there is great significance in the contrast between the medical expense of $10 (for two visits to Dr. Luckey after he left Letterman) and the $13,575 general damages. However, defendant overlooks the fact that it paid the medical and hospital expenses for the two weeks plaintiff was at Mary's Help Hospital, and that her entire treatment at Letterman was at government expense. Were the actual value of these services estimated, there would be no such contrast.

Defendant contends that plaintiff should have minimized the damage by submitting to the treatment to her shoulder which Dr. Luckey discussed at the trial. There was no evidence that plaintiff had been informed that such treatment should be taken. *McNown* v. *Pacific Freight Lines*, 50 Cal.App.2d 221 [122 P.2d 582], applies here. In that case it was contended that an operation would have remedied the respondent's condition, and that by not having it performed, she did not minimize damages. The court noted that the medical testimony concerning the operation was before the jury, and added: ''Nor does it appear that such an operation was previously suggested to respondent and refused by her.'' (P. 228) ''. . . the burden is on defendant to establish matters asserted by him in mitigation or reduction of the amount.

of plaintiff's damage . . .'' (*McNary* v. *Hanley*, 131 Cal.App. 188, 190 [20 P.2d 966].)

While a comparison of verdicts upheld in other cases is of value, it is not conclusive in view of the change in the value of the dollar and the difficulty of finding comparable injuries. In *Mondine* v. *Sarlin*, 11 Cal.2d 593 [81 P.2d 903], the Supreme Court held that while $20,000 was excessive, $10,000 was not, for ''practically the only permanent injury which respondent has sustained is the disfigurement of the right side of his body and the partial impairment of the use of his right hand.'' (P. 600.) It is difficult to compare injuries. However, having in mind the difference in dollar value in 1938, the date of that decision, and a comparison of the injuries, both temporary and permanent, of plaintiff, and the loss of services to plaintiff husband, we cannot say that the damages awarded here are excessive as matter of law. In *Van DerHoof* v. *Chambon*, 121 Cal.App. 118 [8 P.2d 925], the court disapproved in 1932 an award of $7,000 for bruises and lacerations, and two small knee scars. The court expressly stated that there was no evidence of permanent injury, no permanent scars marring the plaintiff's beauty, and no evidence of loss of earning power. The evidence of permanent injury and loss of earning power alone distinguish the case at bar from the Van DerHoof case.

Defendant cites a number of other cases in which allowances of lesser amounts than were awarded here were held to be excessive. As far as the injuries can be compared, they are in the same category, as distinguished from the injuries in the case at bar, as were those in the Mondine case, supra.

## INSTRUCTIONS

Defendant complains of an instruction giving plaintiff's life expectancy and then stating: ''This expectancy is not absolute, and in this respect you make take into account all the evidence relating to the health and physical condition of the plaintiff Sally Blanche Buswell respecting the length of time during which she will suffer such pain, humiliation, disfigurement or disability, if any.''

In view of the testimony that she was still suffering from headaches and nervousness, and that these conditions were likely to be permanent, there was no error in giving plaintiff's life expectancy and then calling the attention of the jury to the fact that the expectancy is not absolute, but to be determined by all the evidence relating to her health

and physical condition in determining the time she might suffer pain or disability, if any.

Plaintiff did have a slight scar over her eye. Whether or not that was disfiguring to any extent does not appear in the record. ■ Whether it was disfiguring was for the jury to determine. It is doubtful if there is any evidence of "humiliation," unless it can be inferred from plaintiff's inability to work. ■ If it was error to use the word, it was not prejudicial. ■ There was evidence to support a finding of "disability." As said in *Loper* v. *Morrison*, 23 Cal.2d 600, at page 611 [145 P.2d 1] : "There was testimony, however, that at the time of the trial plaintiff still was suffering from headaches, nervousness and pain. This evidence tended to prove future damages and was sufficient to justify the instruction."

■ The second instruction attacked by defendants instructed the jury that they might award plaintiff husband reasonable compensation for any loss of his wife's services that he had suffered or "will reasonably suffer in the future . . . In determining the amount—should you decide so to do —your obligation shall be to fix the pecuniary value of the services thus lost. [The remainder of the instruction is claimed to be erroneous.] As to any future loss of the same nature for which you might find him entitled to compensation, your task will be to fix the present pecuniary value thereof. To that end you should consider, as shown by the evidence, the character and conditions of the home wherein plaintiff and his wife have dwelled ; the services, if any, that have been performed by the wife in the management of that household ; the extent to which any work connected with the management of the home has been done by others than the wife ; and the nature, extent and value of any services of an advisory character, although not involving any manual labor or physical skill which have been performed by the wife for the husband."

The evidence showed that there had been a deprivation of the wife's services for approximately six months. While plaintiff had resumed the performance of her usual household duties, there was a probability of future loss of service due to her condition and to the probability that she would require further medical treatment and possibly an operation. The instruction stated the law and was not erroneous.

■ Defendant complains of an instruction that "the failure of a party to produce evidence presumptively in his power to produce will support the inference that such evidence if produced would be unfavorable to his case." This

instruction is a correct statement of the law. It was material in connection with the denial by defendant of liability and because under the evidence there could reasonably have been drawn the inference that the defendant's employees who had immediate access to the damaged rail slot had concealed the nut or bolt which gave way, causing the accident. Defendant contends that the instruction was not offered because of that situation, but because plaintiff had testified that she had been examined by a ''bone specialist selected by the City and County of San Francisco'' to examine her, whom the defendant did not call to the witness stand, and that by the instruction the plaintiff told the jury, in effect, that the doctor's testimony would have hurt the defendant. While it is true that defendant was under no obligation to call the bone specialist as a witness (*McEwen* v. *New York Life Ins. Co.*, 187 Cal. 144 [201 P. 577]), and if the instruction was aimed at this failure, it may have been error to give it, still, under all the circumstances of the case, it could not have been prejudical.

Defendant complains of an instruction which authorized the jury to award plaintiffs damages, not in excess of ''the amount prayed for in the complaint as amended, to wit, the sum of $30,000,'' and that in considering future damages they might take into consideration medical expenses ''reasonably certain to be incurred hereafter as a proximate result of the injury complained of, if any'' and ''the cost of nursing,'' if any. In view of the testimony concerning the necessity of further medical treatment, there was no error in giving this instruction concerning medical expenses and nursing, if any, thereafter to be incurred. Defendant objects most strenuously to the mention by the court of the $30,000 limit, on two grounds: (1) it claims that the complaint had not been amended; and (2) that an instruction mentioning an amount should never be given as it is unfair to the defendant. As to the first point, the objection is highly technical. The amount prayed for in the complaint was $20,000. At the end of the trial and in the absence of the jury, plaintiffs moved to amend the complaint to conform to the proof by increasing the prayer from $20,000 to $30,000. Defendant vigorously objected. The court granted the motion. Apparently the amendment was never formally made to the complaint. However, this was immaterial. The court had permitted the amendment to be made and evidently considered that it had been done.

 The second point brings up the question of whether the court should mention to the jury the amount sued for. It is contended that by so doing the judge in effect is telling the jury that in the particular case he believes that the evidence warrants a finding that any sum within the amount sued for would be reasonable to award as damages. Many judges do not mention the sum sued for. Others do. In *Hollinger* v. *York Rys. Co.*, 225 Pa. 419 [74 A. 344, 17 Ann.Cas. 571], the practice of mentioning the amount is condemned. On the other hand, B. A. J. I., page 198 states: "It is thought by some that the amount of damages alleged in the complaint should not be stated to the jury in the instructions. The editorial committee feel that this is largely a matter of discretion with each judge in each case. However, it is the opinion of a majority of the committee that there is no sound reason why the judge should not state the amount claimed. Counsel may do so, and usually do. We believe that the intended effect of the instruction is made more certain by a frank statement of the amount claimed. A noticeable avoidance of that fact might arouse curiosity. It may well be doubted that a defendant ever is injured by an instruction as here suggested. On the other hand, we feel certain that there have been cases when a defendant was helped by a jury's impression that the plaintiff filed an exorbitant claim. Such a result, however, is plaintiff's own harvest." Assuming that the Hollinger case states the better practice, we cannot say that in California the mentioning of the amount sued for is error.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied January 8, 1949, and appellant's petition for a hearing by the Supreme Court was denied February 7, 1949.