[Civ. No. 14236. First Dist., Div. One. June 15, 1950.]

WHITNEY DUVALL et al., Plaintiffs and Appellants, v. T. W. A. et al., Defendants and Appellants.

Melvin M. Belli for Plaintiffs and Appellants.

Hadsell, Sweet, Ingalls & Murman for Defendants and Appellants.

SCHOTTKY, J. pro tem.—Defendants Transcontinental and Western Air, Inc. (hereinafter referred to as T. W. A.), The Texas Company (referred to in plaintiffs' complaint as Texaco Co.), and Eugene Flaucher, have appealed from judgments entered on verdict of the jury in favor of plaintiffs Whitney Duvall and Alberta Duvall, husband and wife, in an action to recover for personal injuries received in a truck and automobile collision at the intersection of Millbrae Road with the old Bayshore Highway in San Mateo County. The verdict was against all defendants, and the amount awarded Whitney Duvall was $35,000 and $85,000 was awarded Alberta Duvall. The trial court denied the motion of defendants for a new trial, but made an order limiting defendant Texas Company's liability to $10,000. Plaintiffs have appealed from the order so limiting the liability of defendant Texas Company.

### DEFENDANTS' APPEAL

Defendants urge two grounds for a reversal of the judgments: (1) There was contributory negligence on the part of plaintiffs as a matter of law which precludes their recovery of damages; (2) The amounts of damages awarded were so grossly excessive as to indicate passion or prejudice.

The following is a fair summary of the facts relating to the accident, as shown by the record.

On February 15, 1948, at about 1:25 p. m., plaintiff Whitney Duvall was driving his 1933 De Soto sedan in a southerly direction along the old Bayshore Highway in San Mateo County.

He and his wife, plaintiff Alberta Duvall, who was riding with him in the front seat, were returning to Burlingame from the San Francisco Airport where they had seen Mr. Duvall's mother off on a plane to Los Angeles. Bayshore is a four-lane highway, two northbound and two southbound, divided by a double white line. As they approached the intersection with the road which curves out from Millbrae they were driving approximately 35 miles an hour and were in the inner of the two southbound lanes. The weather was clear, and the roadways were dry and level. Millbrae Road runs into Bayshore Highway at an angle of about 90 degrees, but before reaching Bayshore it curves for several hundred feet. It is divided by a white line and a traffic island at the junction with Bayshore, and traffic on Millbrae Road is required to go to the right of the dividing line and the island to enter upon Bayshore. The left lane of Millbrae is for traffic turning right from Bayshore onto Millbrae.

Defendant Flaucher, an employee of defendant T. W. A., was driving a 28-ton, 16-wheel truck and semitrailer loaded with 4,000 gallons of gasoline, and owned by the defendant Texas Company, in an easterly direction on Millbrae Road. He was picking up speed as he rounded the ''Millbrae curve'' and as he approached the intersection of Millbrae Road with old Bayshore, he was, according to his testimony, traveling 20 miles an hour and may have been traveling 24 miles an hour at the time of the impact. In order to turn left onto Bayshore and go north, he entered the intersection to the *left*, instead of right, of the dividing line and of the triangular island designed to separate incoming and outgoing traffic, and crashed into the right side of the Duvall car. Flaucher testified that he did not see the Duvall car until just before he struck it and had not applied his brakes until then. Skid marks were found from the intersection line. There was evidence that his truck left tire burn marks on the curve before any brakes were applied, indicating that he may have been going at a greater rate of speed than he indicated in his testimony.

At the time of the trial, one year after the accident, both plaintiffs were suffering from retrograde amnesia and were unable to remember anything that had happened that day after they had left the airport. A witness for plaintiffs, Frank Ramsey, had gone to the airport in his own car to see Mr. Duvall's mother off on the plane and at the time of the accident was following about 100 feet behind plaintiffs on the Bayshore

Highway. He testified that both cars were going approximately 35 miles an hour and traveling in the inner of the southbound lanes. He could not say whether or not Mr. Duvall turned his head to look for traffic from the Millbrae Road, but did see Duvall's car swerve slightly to the left over the double line about a second before the impact. Ramsey testified that he himself had seen the red tank truck of defendants when he was about 200 yards north of the intersection.

Defendants' first major contention is that plaintiffs were guilty of contributory negligence as a matter of law which precludes their recovery of damages. Before discussing this contention, we quote the language of our Supreme Court in the recent case of *Anthony* v. *Hobbie*, 25 Cal.2d 814, at page 818 [155 P.2d 826] : "Turning to the question of contributory negligence on the part of the decedent, certain rules must be remembered. The burden of proving contributory negligence is upon the defendant. (19 Cal.Jur. 697-699.) True, contributory negligence may be found by the trier of fact from the plaintiffs' own evidence. But cases in which it can be said that the negligence of plaintiff contributes proximately to the accident as a matter of law are rare. The rule has been stated in various ways in a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion."

Defendants point out that Mr. Duvall had never owned an automobile until a few weeks before the accident, and that he then bought a 1933 De Soto sedan, which defendants seem to delight in referring to with great frequency as a "jalopy." However, the record shows that this automobile was in good mechanical condition and that its brakes had been relined a few months before. Defendants then assert that Duvall got his first operator's license a few days after he bought the car and that up to the time of the accident he had apparently taken no driving lessons nor had he in any way acquired any skill in the operation of the old De Soto by driving it on the highway. However, the record shows Duvall testified: "I purchased the car before I got this driver's license. I had a

driver's license before that.'' Furthermore, there is nothing in the record to show that plaintiff Duvall needed any driving lessons or lacked skill in driving. Even though he had never owned a car before, he may, like countless others, have operated the automobiles of others. Also, we are justified in presuming, where there is no evidence to the contrary, that the Division of Motor Vehicles properly performed its duty in granting him an operator's license. It is hardly likely that he would have attempted to drive his mother from Burlingame to the San Francisco Airport if he had a broken-down jalopy and did not know how to operate it.

█ █ Defendants then admit that defendant Flaucher entered the old Bayshore Highway at 20 miles an hour and to the left of the traffic island, but claim that it would not have made any difference if he had gone to his right as ''Mr. Duvall just wasn't looking out for anything and apparently was not even aware of the red Texaco truck which Mr. Ramsey [who was following about 100 feet behind the Duvalls] had been observing for some time.'' Defendants admit the negligence of defendant Flaucher, and then assume that plaintiff Duvall was paying no attention. Defendant Flaucher was coming into the old Bayshore Highway on the Millbrae Road and plaintiff Duvall would certainly have a right to assume that the driver of the truck would not violate the law and cut into the highway on the left side of the traffic island. In view of the evidence here presented and the rule as to contributory negligence, it is difficult to understand how defendants seriously can contend that such evidence shows contributory negligence on the part of plaintiff Whitney Duvall as a matter of law.

Even though there were no presumption that plaintiff Duvall took ordinary care for his own concern, we believe that the record amply supports the implied finding of the jury that the proximate cause of the accident was the negligence of defendant Flaucher and that there was no contributory negligence on the part of plaintiff Duvall. But the instant case is one in which a plaintiff by reason of injuries resulting from the accident is unable to testify as to the circumstances surrounding the accident due to loss of memory from brain injury, and in such a case he is entitled to a presumption that he exercised due care. This presumption is in itself a species of evidence and it is for the jury to say whether or not it has been overcome by evidence to the contrary. In *Scott* v. *Sheedy*, 39 Cal.App.2d 96, this court said, at page

101 [102 P.2d 575] : ''Under the circumstances, in view of the reason for the rule as stated in the Westberg case [*Westberg* v. *Willde*, 14 Cal.2d 360 (94 P.2d 590)], we feel it can make no difference whether the injured party dies or is incapacitated by loss of all memory of the circumstances of the accident, the result of brain injury from the collision. In other words, notwithstanding the evidence from other witnesses, 'all possible facts both in favor of and against the alleged negligence of the plaintiff' (*Westberg* v. *Willde, supra*) were not before the court. In this case no witness could have testified that plaintiff saw the danger. A witness might place him in a position from which an inference might be drawn that he could see or realize danger, but that would not be sufficient if a reasonable inference otherwise could be drawn. If the acts and conduct of an incapacitated party must be testified to by other witnesses, we conclude that the test given in the Westberg case and in *Mar Shee* v. *Maryland Assur. Corp.*, 190 Cal. 1 [210 P. 269], is proper. In the Mar Shee case, the court (p. 9) said: '. . . we deduce that a fact is proved as against a party when it is established by the uncontradicted testimony of the party himself or of his witnesses, under circumstances which afford no indication that the testimony is the product of mistake or inadvertence; and that when the fact so proved is wholly irreconcilable with the presumption sought to be invoked, the latter is dispelled and disappears from the case.' ''

We conclude, therefore, that there is no merit in defendants' contention that there was contributory negligence on the part of plaintiffs which precludes their recovery of damages.

Defendants' next contention is that the sums of $35,000 and $85,000 awarded to Mr. and Mrs. Duvall, respectively, were so grossly excessive as to indicate passion or prejudice on the part of the jury and thus to require a reversal of the judgments.

The determination of the amount of damages to be awarded to a plaintiff is primarily a question for the jury, under proper instructions from the court. The trial judge, who in passing upon a motion for a new trial is in effect the thirteenth juror, may reduce the amount of the judgment if he deems it to be excessive by granting a new trial unless the plaintiff agrees to such reduction. But when a jury has fixed the amount of damages, and where, as here, the trial judge has impliedly approved the award by denying a motion for a new trial, an appellate court may interfere only if it appears from the

record, as a matter of law, that the verdict was the result of passion or prejudice. As this court said in *Gluckstein* v. *Lipsett*, 93 Cal.App.2d 391, at page 400 [209 P.2d 98] : "The test to be applied in cases where it is contended that the damages awarded are excessive was stated by us in *Bushwell* v. *City & County of San Francisco*, 89 Cal.App.2d 123 [200 P.2d 115], to be (p. 127) 'a comparison of the amount of the verdict with the evidence before the trial court.' Taking into consideration the disfigurement, the humiliation, the pain and the malignancy, we cannot say that the award of $115,000, large as it is, is so far out of line as to show passion and prejudice on the part of the jury. It is not a question of what we would award (*Nason* v. *Leth-Nissen*, 82 Cal.App.2d 70 [185 P.2d 880]), but whether we can hold that it indicates that type of action by the jury. 'Generally speaking, . . . if there is substantial evidence in the record supporting the damages awarded by the jury and it is inferentially approved by the trial judge by his denial of a motion for new trial without reducing the damages, we are powerless to reduce them or to hold the award excessive.' (*Holmes* v. *Southern Cal. Edison Co.*, 78 Cal.App.2d 43, 52 [177 P.2d 32].) In considering the amount of the verdict, we must bear in mind the present day situation as expressed in *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176, 187 [195 P.2d 427] : 'It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [citing cases] . . .' "

 Mrs. Duvall was 28 years of age when the accident occurred, and was apparently in good physical condition. Her injuries consisted of a brain concussion; three fractured ribs, one with a piece split off; multiple fractures of the pelvic area; a comminuted fracture (bone splintered and broken into many pieces) of the right leg; rupture of the bladder, and many ligaments, tendons and nerves pulled out of place and broken. She was delirious for several days after being admitted to the hospital, a number of drainage tubes were placed in her bladder, and opiates were continually administered for pain. During treatment she developed jaundice from the many blood transfusions, and a pulmonary embolus (blood clot on lungs) formed, as well as thrombo phlebitis (clot in leg). Traction was placed on her leg. She was in serious danger of her life for most of the eight months she was in the hospital. At the time of trial, the right leg was smaller and an inch

and a half shorter than the other, there was a permanent distortion of the pelvic area, a steel wire was permanently in her leg and she could walk by taking only a few steps at a time. She had pain in her back, was very uncomfortable when sitting, did not have full use of her right leg as the knee would not bend, and had little feeling in the lower part of her right foot. She had more painful headaches than previously, considerable heart palpitation at times, and some bladder trouble remained. It was testified to by Dr. E. W. Cleary, specialist in orthopedics, who attended Mrs. Duvall, that having a child would be a great threat to her life, and that further improvement in her condition was problematical. Dr. Cleary testified: "I think the chances are she will have pain, intermittently at least, the rest of her life. I don't think she will ever attain a degree of physical confidence so that she will have any considerable freedom of action. She may get well enough to get out of the wheelchair and discard her crutches and walk about her own home to a limited degree, but she will always be, in my opinion, under the hazards of acute complications of some sort or other, associated with the extensive damage she suffered."

Plaintiffs in their brief itemize the special damage to Mrs. Duvall at $46,016.13. There was some conflict as to whether she should be allowed a sum as compensation for loss of future earnings. She formerly had worked as a beauty specialist in Chicago and more recently in California had been a clerk at Montgomery Ward & Company, though prior to the time of the accident she had left that job to care for a member of her family who was ill.

Mr. Duvall, 35 years old and in good health prior to the accident, suffered a broken hip, a break in the back of the pelvis and at the sacroiliac joint, broken ribs and an occipital skull fracture. At the time of the trial he had frequent severe headaches, dizziness, backache, and fatigued quickly. He used a cane continuously because of back and hip pain when walking; "he walked with hesitation and a limp," his right leg would cramp, and he had a tremor due to a general nervousness. He had a permanent distortion of the pelvic area and permanent impairment of the right sacroiliac area. He also had been unable to smell anything since the accident. Dr. Cleary testified with respect to Mr. Duvall: ". . . it is reasonably probable that he will not be able to undertake any strenuous regular activity from now on. . . . In order to get this

bone injury, he has to have had, at the time of the impact of the accident, violence enough so that he must have had a lot of tearing of ligaments and muscles in that area. There is the scar left there in that sort of tearing, from the spilling of blood into the tissue, which shrinks and turns into scar to a certain extent. I don't know how much those scars are going to affect him. Those scars do have a tendency to increase the pain, and to produce chronic pain, at age particularly.'' The loss of physical strength and loss of his sense of smell seemed to assure plaintiff of the fact that he could no longer carry on his trade of baker, the only one he knew and had ever followed. His special damages are itemized in plaintiffs' brief and total $103,364.60.

Many cases in which verdicts of juries have been reduced by appellate courts have been cited by defendants, but it would serve no useful purpose to discuss these cases as each must be determined upon its own facts. Considering the extent of injuries suffered by plaintiffs as hereinbefore detailed, and applying the rules laid down by this court in *Gluckstein* v. *Lipsett, supra,* and in the still more recent case of *Sullivan* v. *City and County of San Francisco,* 95 Cal.App.2d 745 [214 P.2d 82], we are convinced that we may not say that, as a matter of law, the verdicts are excessive.

### PLAINTIFFS' APPEAL

Plaintiffs have appealed from the order of the trial court limiting the liability of defendant Texas Company to the sum of $10,000. Plaintiffs contend that defendant Flaucher, the driver of the truck, was the agent, actual, ostensible or sub-agent of the defendant Texas Company, and thus coming within the exception of section 402(b) of the Vehicle Code its liability under section 402(a) was not limited.

Said section 402 provides: ''(a) [In general] Every owner of a motor vehicle is liable and responsible for the death of or injury to person or property resulting from negligence in the operation of such motor vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner, and the negligence of such person shall be imputed to the owner for all purposes of civil damages. (b) [Limitation of liability.] The liability of an owner for imputed negligence imposed by this section and not arising through the relationship of principal and agent or master and servant . . . is limited to the amount of ten thousand dollars ($10,000) with respect to the

death of or injury to more than one person in any one accident . . .''·

In the instant case the question of whether defendant Flaucher was an agent of the defendant Texas Company was not submitted to the jury, and no instructions upon that issue were requested or given. Counsel on both sides evidently preferred to have that matter determined by the court after the verdict, and it was so agreed in chambers. Thereafter the motion to limit the liability was made and in its order denying defendants' motion for a new trial the court included an order limiting the judgment to $10,000 as to defendant Texas Company.

■ It was admitted that the truck was owned by the defendant Texas Company but denied that defendant Flaucher was an employee or agent of said defendant. The evidence showed that the truck was loaned to defendant T. W. A. by The Texas Company to be used in hauling products of The Texas Company. Gasoline was delivered to the T. W. A. bulk storage plant in San Mateo by defendant Texas. Company and from there defendant T. W. A. transported its own gasoline to the airport in The Texas Company's truck. It was on one of these trips from the bulk storage plant to the airport that the accident occurred. Defendant Flaucher was at no time employed by The Texas Company and it had no control over him or over the truck which was garaged and fueled by T. W. A. Defendant Flaucher was actually an employee of T. W. A. and drove for its benefit exclusively. He was hired by T. W. A. to haul gasoline from one T. W. A. location to another.

Plaintiffs contend that defendant Flaucher was the ostensible agent of defendant Texas Company, and it was therefore liable for his torts under Civil Code, section 2300, which provides: ''An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.''

Plaintiffs point out that the truck was painted the typical bright red of The Texas Company truck, had its insignia upon the door and also that the license plates had been applied for by The Texas Company. Plaintiffs argue that by allowing Flaucher to drive the truck which so obviously belonged to The Texas Company it created in the minds of third persons the belief that Flaucher was its employee. There

are of course instances in which an ostensible agency may be created by permitting a person to drive a truck under such conditions, but it cannot reasonably be contended that a motorist would be more likely to wish to collide with a truck bearing the insignia of The Texas Company than with one bearing any other insignia.

The question of whether defendant Flaucher was an agent of defendant Texas Company was a matter for the trial court to determine upon the evidence in the case. We believe that the record not only amply supports the conclusion of the trial court that defendant Flaucher was not an agent of defendant Texas Company but it is difficult to understand how it could have arrived at any other conclusion.

In view of the foregoing, the judgments appealed from are affirmed, and the order limiting the liability of defendant Texas Company to the sum of $10,000 is affirmed; plaintiffs to recover their costs on the appeal.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 15, 1950.