[Civ. No. 20558. Second Dist., Div. Two. Mar. 23, 1955.]

RICHARD HARRIS, a Minor, etc., et al., Respondents, v. SEYMOUR LAMPERT et al., Appellants.

W. P. Smith for Appellants.

Harry Aides and Robert H. Green for Respondents.

FOX, J.—Defendants appeal from the judgment on the ground that the award of damages for personal injuries is excessive.

The accident occurred on October 11, 1952, at the intersection of North Figueroa Street and Avenue 43 in the city of Los Angeles. The operator of defendant's truck drove through a red traffic signal and collided with plaintiff, Richard Harris, who was on his motorcycle, seriously injuring him. The case was tried before a jury in February, 1954, resulting in a unanimous verdict of $47,369 in favor of plaintiff. A motion for a new trial, on the ground that the damages were excessive, was made and in due course denied.

The determination of the amount of damages to be awarded to an injured party is primarily a question for the jury. The trial judge, however, may reduce the amount of the judgment if he deems it to be excessive by granting a new trial unless the plaintiff agrees to such reduction. But when a jury has fixed the amount of damages, and where, as here, the trial judge has impliedly approved the award by denying a motion for a new trial, an appellate court may interfere only in the event it appears from the record, as a matter of law, that the verdict was the result of passion or prejudice. (*Roedder* v. *Rowley*, 28 Cal.2d

820, 823 [172 P.2d 353]; *Duvall* v. *T.W.A.*, 98 Cal.App.2d 106, 111-112 [219 P.2d 463].) The test to be applied in such cases is "a comparison of the amount of the verdict with the evidence before the trial court" (*Buswell* v. *City & County of San Francisco*, 89 Cal.App.2d 123, 127 [200 P.2d 115]; *Gluckstein* v. *Lipsett*, 93 Cal.App.2d 391, 400 [209 P.2d 98]) for the purpose of determining whether the award is so far out of line as to show passion or prejudice on the part of the jury. (*Duvall* v. *T.W.A., supra.*) "It is not a question of what we would award (*Nason* v. *Leth-Nissen*, 82 Cal.App.2d 70 [185 P.2d 880]), but whether we can hold that it indicates that type of action by the jury ▆ 'Generally speaking, . . . if there is substantial evidence in the record supporting the damages awarded by the jury and it is inferentially approved by the trial judge by his denial of a motion for new trial without reducing the damages, we are powerless to reduce them or to hold the award excessive.' (*Holmes* v. *Southern Calif. Edison Co.*, 78 Cal.App.2d 43, 52 [177 P.2d 32].) ▆ In considering the amount of the verdict, we must bear in mind the present day situation as expressed in *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176, 187 [195 P.2d 427] : 'It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral.' " (*Duvall* v. *T.W.A., supra*, p. 112.) When these rules are applied to the facts of this case it is clear it cannot be held that the verdict is excessive as a matter of law.

▆ The injuries were serious, painful, and certain of them are permanent in character. The record shows the following : The injured plaintiff\* was a young man 17 years of age when the accident occurred; his average life expectancy was 48.35 years; he was employed by Beckman Instruments in South Pasadena and earning $50 per week. He remembered nothing about the collision, having been rendered unconscious thereby. He was removed to the General Hospital where restraints were placed on his hands and feet and attached to the sides of bed. He was not able to carry on an intelligible conversation for approximately 10 days. Examinations and X-rays disclosed that he had suffered a severe basal skull fracture so deep that it caused some spinal fluid to leave the brain

---

\*For convenience hereinafter, the plaintiffs will be referred to in the singular.

through the left ear canal. The eardrum had been lacerated as a result of the linear type skull fracture so that one can see right into the middle ear. The skull fracture also caused injury to the brain. Plaintiff received a chip fracture of a bone in his left foot which resulted in a bruise of a sensory nerve, and a severe sprain of his left shoulder. Plaintiff suffered severe pain from these injuries and developed a throbbing headache and a constant buzzing in his left ear. When he left the hospital on November 4 he dressed but could not get his left shoe on because his foot was swollen. His ear was stuffed with cotton and his head was bandaged. He went down to his mother's car at the ambulance entrance in a wheelchair.

Upon his return home Richard was placed under the professional care of Dr. John D. Abbey, a specialist in the field of otolarynology and Dr. Mark T. Steele, a specialist in orthopedics and traumatic injuries.

Plaintiff was under the care and treatment of Dr. Abbey until in April, 1953, and Dr. Steele throughout that year. The doctors examined plaintiff a number of times during these respective periods. Both doctors reexamined him in February, 1954, just prior to the trial.

Following his return home from the hospital plaintiff had severe, throbbing headaches three or four times a week in the front and top portions of his head; the rest of the time he had a constant, tight band-like ache as though someone were squeezing the front part of his head. He was also still bothered with a humming, doorbell-like noise in his left ear. He had become somewhat deaf in that ear. During these recuperative months he not only suffered considerable pain from these sources but also from his injured foot and shoulder.

At the end of March, 1953, plaintiff returned to work, running a punch press. He kept the job for two or three months, being compelled to quit because of throbbing and pounding headaches. After resting for a while at home, plaintiff got work at the Luther Engineering Company, in Los Angeles, operating an hydraulic press; he became ill, however, after about two weeks and had to give up this employment. While on this job, plaintiff continued to have headaches and his ear still buzzed, but the drainage had stopped. After leaving the Luther Engineering Company, plaintiff rested and went to Bakersfield, in July, where his family was then living. About the middle of July, 1953, plaintiff went to work for Crown Motor Rebuilding, driving a truck; he worked there

until the end of August, when he took a leave of absence for a week. He returned to this job and remained with it until November, when he went back to Bakersfield to live with his family. He worked on a ranch in that locality for some seven weeks, returning to Los Angeles in January, 1954, where he was employed by Barnett's Chevrolet, detailing cars that came in for lubrication and doing other work around the place. He was discharged after two or three weeks because of absences. He was not employed at the time of trial, in February, 1954. During all this time he continued to have both kinds of headaches, and the buzzing noise in his ear was constant. There was no improvement in any of these conditions; also, the injury to his shoulder interfered with any work that required lifting.

Before the accident plaintiff played baseball, football, and basketball and engaged in other sports. Since then he has not participated in any such activities. He had quit school because of financial difficulties.

The testimony of Dr. Abbey and Dr. Steele, whose last examinations of plaintiff were some 16 months after the accident, discloses the following: (a) A permanent brain injury; (b) persistent headaches, which will probably continue for the balance of his life; (c) personality change; (d) tinnitus, or a constant ringing in the ear, for which there is no cure; (e) a deafness in the ear as to high tones, which will become worse as plaintiff grows older; and (f) restrictions as to the type of work in which plaintiff can participate in view of his injuries.

The testimony reveals that this was a severe basal skull fracture and produced "a permanent injury of the brain in the middle as well as in the frontal part, but more particularly in the frontal lobe." In this connection, Dr. Steele was asked: "Is there a certain portion of the brain that is more persistent and where the damage lasts longer than any other portion?" His answer was, "Yes, the frontal lobe. The frontal lobe does not recover as well and these basal skull fractures are at a point where the principal functions of the brain are located."

The headaches were related to the brain injury. In response to a question from the court, Dr. Steele testified that plaintiff "had a permanent condition there in the frontal lobe, which causes persistent permanent headaches." It was his opinion that these will probably continue for the remainder of his life.

On the question of a personality change in the plaintiff as a

result of the accident, the following evidence was given by Dr. Steele in response to the court's interrogation:

"Q. Did I understand you to say that you observed and found a personality change?* A. Yes.

"Q. That was a finding? A. Yes, it was. I noticed that myself.

"Q. By the Court: And that was an objective finding? A. Yes.

"Q. Have you given us all the permanent residuals? A. Well, this ear condition is probably permanent, but I would have to depend upon Dr. Abbey's report on that.

"Q. Outside of that, you would adopt his report if you answered that question? A. Yes.

"Q. So far as your field is concerned, you have given us the residuals you feel are there? A. Yes.

"Q. As to the prognosis of those in the future, have you given us that? A. Yes, I said as long as they have persisted for a period of a year, these headaches particularly, and these personality changes, they would be permanent."

With reference to tinnitus, or the ringing in plaintiff's left ear, Dr. Abbey testified: "There is no cure for tinnitus where you have the damage that is there." He further stated: "As far as the ringing in the ear is concerned, I feel he will have that with him always."

As to plaintiff's ability to hear high tones with the injured ear and his prognosis of that condition, Dr. Abbey testified: "I believe his [sic] chances of his having high-tone deafness, which he shows on his audiometric, is inevitable. It will not improve. The ringing and the audiometric are enough to prove that to my mind. With that much refraction of the eardrum, he may lose another 20 decibels of hearing as he grows older, . . ."

---

*Dr. Abbey gave the following testimony on this subject:

"Q. . . . In giving the prognosis, guarded as to brain damage, did you take into account other factors that develop from a brain injury? A. Yes.

"Q. What are they? A. Well, of course, you would consider such things as personality changes.

"Q. Let me stop you for a minute, by personality changes, what do you mean by that? A. Personality changes are more or less of—well, the frontal lobe is the section of the brain that has to do with our personality, and if we have a damage up there we get changes, irritability and dizziness. Headaches are a different mechanism, and the way we get along with people, the way we respond to our work, and the way we adjust ourselves to society. Those are all what we call personality changes.

"Q. Do personality changes follow basal skull fractures in the frontal lobe? A. Yes, they can, absolutely."

As to the restrictions on the type of work, Dr. Steele testified that heavy work or manual labor was not desirable, particularly if its performance required bending or stooping, since these movements have a tendency to cause the blood to go to the brain and this would serve to aggravate the result of the injury, particularly his "persistent headaches." The doctor was also of the opinion that plaintiff should not work in a machine shop with hydraulic presses or drills, nor as a mechanic in a garage, which required crawling under cars, nor should he do pick and shovel work, for all of these required bending and stooping, and such changes of position would tend to increase the severity of his headaches. He could, however, hold a desk job where there would not be too much mental effort, or he could drive a light truck where he did not have to do any heavy lifting.

Special damages amounting to a little more than $4,000 were established. These consisted of loss of wages; hospital, X-rays, prescriptions and doctor bills (including $300 for future services); and damages to his motorcycle.

Taking together everything shown by the evidence, including the nature and extent of the injuries; the permanent character of certain of them; the pain and suffering which plaintiff has undergone, some of which very likely will continue for an indefinite time; the restrictions upon the type of his future employment, and the depressed value of the dollar today, we cannot say that the verdict is in such an amount as to indicate passion or prejudice on the part of the jury, or that it is not sufficiently supported by the evidence. (*Risley* v. *Lenwell*, 129 Cal.App.2d 608, 625, 626, 645 [277 P.2d 897]; *Johnston* v. *Long*, 30 Cal.2d 54, 76 [181 P.2d 645].)

Defendants have cited a number of personal injury cases in which verdicts of juries have been reduced. It would serve no useful purpose, however, to discuss them as each must be decided upon its own facts. (*Duvall* v. *T.W.A.*, 98 Cal.App. 2d 106, 114 [219 P.2d 463]; *Risley* v. *Lenwell, supra,* p. 750.)

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied April 11, 1955, and appellants' petition for a hearing by the Supreme Court was denied May 18, 1955.