**Charlotte STEWART, Plaintiff,**

v.

**Mohammed MIDANI, Richard E. Schmidt and Bartow County Hospital Authority, d/b/a Sam Howell Memorial Hospital, Defendants.**

**Charlotte STEWART, Executrix of the Estate of Ronald A. Stewart, Deceased, Plaintiff,**

v.

**Mohammed MIDANI, Richard E. Schmidt and Bartow County Hospital Authority, d/b/a Sam Howell Memorial Hospital, Defendants.**

**Civ. A. Nos. C80-161R, C80–162R.**

United States District Court,
N. D. Georgia,
Rome Division.

Nov. 5, 1981.

Henry Angel, C. Wade McGuffey, Jr., Savell, Williams, Cox & Angel, Atlanta, Ga., for plaintiff.

George W. Hart, Phillips, Hart & Mozley, Robert G. Tanner, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., Oscar M. Smith, C. Wade Monk, Smith, Shaw, Maddox, Davidson & Graham, Rome, Ga., for defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

Ronald A. Stewart died at his home in Ohio on August 15, 1978. These two actions, the first for wrongful death and the second for pain and suffering, medical and funeral expenses, were instituted by the decedent's wife and executrix of his estate against two doctors and a hospital.

Two days prior to his death, the decedent entered the emergency room at the Sam Howell Memorial Hospital complaining of chest pains, shortness of breath, teeth hurting and other ailments. The decedent was examined by Dr. Mohammed Midani who was on duty in the emergency room. The complaint alleges that Dr. Midani misdiagnosed the decedent's ailment, and failed to order certain tests which would have revealed the actual cause of the symptoms. Dr. Midani is a member of a group of physicians who provide emergency room service to the Sam Howell Memorial Hospital. Dr. Richard E. Schmidt was in charge of this group of physicians.

Before the Court are the motions for summary judgment filed by the hospital and Dr. Richard E. Schmidt. Because there are genuine issues of fact concerning the relationship between the two defendants and Dr. Midani, the question of whether these two defendants may be held vicariously liable for the acts of Dr. Midani must be presented to a jury. The motions for summary judgment are, accordingly, denied.

In 1975, Dr. Schmidt, along with two other doctors, signed a contract with the hospital to provide emergency room services. The contract is ostensibly between the hospital and the "group" of doctors; however, the group has no legal status: each doctor signed the contract individually. Nobody signed on behalf of the group.

At the time of the incident in August 1978, one of the doctors had left, and Dr. Schmidt recruited Dr. Midani to provide full-time (8 hours per day) service to the emergency room. The contract was never amended. Dr. Midani was never a signatory.

The contract provided that the doctors would charge emergency room patients a standard fee. The hospital would collect all bills and remit to the group[1] 80% of these collections. The contract provided that the group would receive a minimum of $16,666.66 per month. Originally, the three signatories divided the money sent by the hospital according to the hours they worked.

---

1. The record indicates that the group was paid by check in the name of the group. Schmidt depo. at 9.

Any extra money[2] was divided among the three doctors equally.

Dr. Midani was paid strictly by the hour: he apparently did not divide any "overage or excess." In the event that the hospital had to pay the group a sum to meet the $16,666.66 minimum, it is not apparent in the record whether Dr. Midani would share in a division of that sum. The record does not disclose the hourly wage paid to Dr. Midani; however, it was somewhat less than what the other doctors in the group paid themselves on an hourly basis. Schmidt depo. at 23.

Dr. Midani paid his own taxes (Dr. Schmidt did not withhold any federal taxes). Dr. Midani paid for his own medical malpractice insurance (which Dr. Schmidt and the contract required him to have). When asked at his deposition about who set the hours of work for the group members, Dr. Schmidt replied, "I did essentially with the advice and the consent though of the other members." Schmidt depo. at 27. Dr. Midani stated that the hours he worked were "arranged between me and [Dr. Schmidt], like whenever he needs me to work for him and he will call me up and I will see if my schedule will agree ..." Midani depo. at 14. *See also, id.* at 24.

Dr. Schmidt characterized himself as the "head" of the group. Schmidt depo. at 10, 14. "I took over the management of the emergency room in 1975." *id.* at 17; "I make the decisions for the group. You know, of course with interaction and opinions from the other members in the group." *id.* at 15.

Dr. Midani stated that "Dr. Schmidt asked me if I was willing to do part-time work for him at the emergency room.... [W]e agreed that I would work for him, part-time basis." Midani depo. at 13.[3]

The contract between the hospital and the group explicitly characterizes the group as an independent contractor. The "group" is defined as Dr. Schmidt, Dr. Burnett and Dr. May. The contract also provides that the stockholders, directors, employees and servants of the group are not the employees or servants of the hospital.

I

DISCUSSION

Although the plaintiff alleged in her complaint that Dr. Schmidt negligently supervised Dr. Midani, and was negligent in hiring Dr. Midani, it is apparent that these theories of liability have been abandoned. The plaintiff's primary thesis is that Dr. Schmidt should be held vicariously liable under the doctrine of respondeat superior.

In reviewing Georgia appellate decisions, the Court has found a legion of cases which focus on the doctor-hospital relationship. Yet, the Court has not located a case which examined the relationship between an emergency room "group" and one of its members. Nevertheless, the doctor-hospital cases are instructive.

The specific issue presented in this case— whether an individual is an employee or an independent contractor—defies facile explication. The Georgia Courts have struggled with a variety of factual situations, and although a general rule has been synthesized, its application has proven most troublesome. For a thorough review of the caselaw on this subject, the parties are invited to review this Court's order in *Harris v. City of Chattanooga*, 507 F.Supp. 365 (N.D.Ga.1980).

■ The general test is whether "the employer assumes the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." *Blair v. Smith*, 201 Ga. 747, 748, 41 S.E.2d 33 (1947); *Forte*

---

**2.** The contract does not provide for any "extra money." However, in Dr. Schmidt's brief, it is stated "[A]ny overage or excess amount not paid to the physicians was divided among the three. Additionally, any losses, had there been any, would have been divided equally between the three." Brief of defendant Dr. Schmidt at 2.

**3.** In August of 1978, however, Dr. Midani was apparently working full-time at the emergency room. Schmidt depo. at 20, 24.

*v. Lewis,* 241 Ga. 109, 110, 243 S.E.2d 38 (1978). Elaborating on this rule in *Employer's Mutual Liability Ins. Co. of Wausau v. Johnson,* 104 Ga.App. 617, 620, 122 S.E.2d 308 (1961), the court stated,

> The right to control the time of doing the job means the right to control the hours of work. The right to control the manner and method means the right to tell the employee how he shall go about doing the job in every detail, including what tools he should use and procedures he shall follow.

In evaluating the relationship between a hospital and a doctor, the Georgia courts initially displayed no reluctance to apply the general rule. The decision in *Pogue v. Hospital Authority of Dekalb Co.,* 120 Ga. App. 230, 170 S.E.2d 53 (1969) illustrates the extent to which the Georgia courts adhered to the basic doctrine. There, the plaintiff was suing the hospital for the alleged negligence of an emergency room physician, who, like here, was a member of an Emergency Room group which had a contract to provide services to the hospital. The court held,

> [The contract] specified in detail the duties assumed by the partnership and which patients would be treated by members of the partnership. However, this was merely the identification of the work to be performed, and did not amount to a reservation of control over the manner in which services were to be performed.
>
> .    .    .    .    .
>
> A hospital is not liable for the negligence of a physician employed by it where the negligence relates to a matter of professional judgment on the part of the physician when the hospital does not exercise and has no right to exercise control in the diagnosis or treatment of illness or injury.
>
> .    .    .    .    .
>
> [The contract] did not give the [hospital] the right to direct specific medical techniques employed in rendering the services, and thus did not change the partnership's status from that of an independent contractor.

*Id.* at 230–31, 170 S.E.2d 53. Similar language can be found in decisions of earlier vintage. *Black v. Fischer,* 30 Ga.App. 109, 117 S.E. 103 (1923); *Clary v. Hospital Authority of Marietta,* 106 Ga.App. 134, 126 S.E.2d 470 (1962). *Cf. Jeter v. Davis-Fischer Sanitarium Co.,* 28 Ga.App. 708, 711, 113 S.E. 29 (1922) (no explicit discussion of respondeat superior liability); *Emory University v. Porter,* 103 Ga.App. 752, 120 S.E.2d 668 (1961) (no allegation of vicarious liability); *Mull v. Emory University, Inc.,* 114 Ga.App. 63, 64, 150 S.E.2d 276 (1966) (distinguishing between the doctor's exercise of medical judgment and his performance of a ministerial function).

During the last eight years, the Georgia Court of Appeals has addressed the issue in five significant cases: *Newton County Hospital v. Nickolson,* 132 Ga.App. 164, 207 S.E.2d 659 (1974); *Hill v. Hospital Authority,* 137 Ga.App. 633, 224 S.E.2d 739 (1976); *Hodges v. Doctors Hospital,* 141 Ga.App. 649, 234 S.E.2d 116 (1977); *Overstreet v. Doctors Hospital,* 142 Ga.App. 895, 237 S.E.2d 213 (1977); and *Hollingsworth v. Georgia Osteopathic Hospital, Inc.,* 145 Ga. App. 870, 245 S.E.2d 60 (1978). Each of these cases deserves careful consideration.

In *Newton County Hospital v. Nickolson, supra,* the court substantially limited the breadth of the *Pogue* decision. Nickolson alleged that a physician in the emergency room was negligent in both the diagnosis and treatment of him. The hospital moved for summary judgment on the grounds that the doctor was an independent contractor. The court reviewed the relationship between the hospital and the doctor: the hospital hired doctors to manage the emergency room on nights and weekends; the hospital administrator personally chose the doctors and arranged their work schedules; no director, officer, agent or employee of the hospital had any right to exercise control over the method or manner of diagnosis or treatment of patients by the doctor; the hospital paid the doctor $12.00 per hour. The court held that the trial court properly denied the hospital's request for summary judgment.

The court reviewed the *Pogue* decision. *Pogue* announced the simple rule that if the hospital does not control the manner in which the physician diagnoses and treats patients, then the hospital is not liable. *Pogue*, 120 Ga.App. at 231, 170 S.E.2d 53. The *Nickolson* court, however, ruled that the hospital is not liable if it does not control the physician's diagnosis and treatment of patients *and* the physician is not an employee. Of course, this is double-speak. Whether the hospital controls the method of diagnosis and treatment is the test by which the court decides whether the doctor is an employee or an independent contractor.

The court then considered three features of the doctor-hospital relationship: (1) The hospital exercised no control over the manner, the methods, or the means of the execution of the work; (2) the hospital did exercise control over the time that the doctor worked; (3) the doctor was paid an hourly wage. Although the first feature exemplifies the independent contractor status, the latter considerations are indicative of an employee-employer relationship. The insignificance of the first feature (in the Court's analysis) is evidenced by the Court's remark, "[that] only clouds the servant-independent contractor controversy." *Id.*, 132 Ga.App. at 167, 207 S.E.2d 659.

The Court again reviewed *Pogue*, and once again stated that *Pogue's* "control" analysis was irrelevant in the context of *Nickolson*, because in *Pogue*, the doctor was an independent contractor. To repeat, what seems to have escaped the *Nickolson* court was that the "control" analysis in *Pogue* was undertaken for the purpose of establishing that the doctor was an independent contractor.

The *Nickolson* court concluded by observing that in *Pogue* there was a contractual relationship between the hospital and an emergency room partnership which identified the emergency room doctors as independent contractors. The *Nickolson* court apparently attached significance to that contract label. The *Pogue* court, although noting that passage in the contract, did not rely on the label in evaluating the relationship between the doctor and the hospital.

There is similar language in the contract in this case. It is settled doctrine that mere labels are not determinative of legal relationships, even as between parties to the contract. *Washington Rd. Properties v. Home Insurance Co.*, 145 Ga.App. 782, 784, 245 S.E.2d 15 (1978). The concern is with essence, not nomenclature.

In *Hill v. Hospital Authority*, 137 Ga.App. 633, 224 S.E.2d 739 (1976) (like *Nickolson*, authored by Judge Clark and concurred in by Judge Quillian), the court reviewed a trial court jury charge which instructed, "ordinarily a physician or surgeon on the staff of a hospital is not an employee of such hospital in the rendering of medical services, and the hospital is not responsible for the acts of the physician in rendering professional services." *id.* at 642, 224 S.E.2d 739. Judge Clark pronounced this a "proper statement of a correct principle of law." *id.* No mention of *Pogue*. No mention of *Nickolson*. No mention of control, time, or basis of pay. Implicitly, however, *Pogue* was resurrected.

Judge Quillian, who had concurred in *Nickolson* and *Hill*, added a novel twist to the analysis in his decision in *Hodges v. Doctors Hospital*, 141 Ga.App. 649, 234 S.E.2d 116 (1977). In *Hodges*, the allegedly negligent conduct was perpetrated by an emergency room physician. The court considered *Pogue* and its ancestor, *Clary, supra*. Incredibly, the court held that the control analysis embodied in the *Clary* and *Pogue* decisions applies "only after it is determined that there is an independent contractor relationship." *Hodges, supra*, 141 Ga.App. at 651, 234 S.E.2d 116. The court does not explain why the control analysis should be undertaken at all if the employee-independent contractor controversy has been settled.

The *Hodges* court reviewed the circumstances surrounding the relationship between the doctor and the hospital: the doctor was not being paid at the time of the incident, but was "covering" the emergency room, as is required of all staff physicians

at certain times. The doctor was paid $100 for service provided during the day, but was paid nothing at night. The hospital controlled the time of the doctor's work.

The court emphasized (1) that the hospital scheduled the doctor's emergency room rotation; (2) that the hospital paid the doctor (although not on this occasion); and (3) that the hospital required the doctor to serve on rotation as a prerequisite for membership on the hospital staff. The court reversed the trial court's grant of a directed verdict for the hospital: "While the evidence was not conclusive, it was sufficient to raise a jury question." *Hodges, supra* at 653, 234 S.E.2d 116.

In *Overstreet v. Doctors Hospital*, 142 Ga.App. 895, 237 S.E.2d 213 (1977), the plaintiff again attempted to visit the emergency room physician's negligence on the hospital. *Pogue* was again exhumed, the court holding that since the hospital reserved no right to control the manner and method by which the physician treated and diagnosed patients, the doctor was an independent contractor.

*Hodges* was distinguished: "In that case, the emergency room physician did not work under a written contract which specified in detail the services required of him and which disavowed any control over his manner or means of performance, but instead worked under a loose arrangement with the hospital, which required him to 'cover' the emergency room on certain occasions as a prerequisite to remaining on the hospital staff." *Overstreet, supra* at 897, 237 S.E.2d 213. ·

The court examined the doctor-hospital relationship: The doctor was employed by the Director of Emergency Room Services who had a contract with the hospital. The contract provided that the hospital would not exercise any control over the emergency room physicians' diagnosis or treatment of patients. The Director had numerous responsibilities involving assurances of quality, maintenance of records, and the establishment of rules and regulations. The Director was entitled to the cash receipts for the services performed, with the hospital serving as agent for collection, but was guaranteed a certain fixed minimum annual amount regardless of receipts. *id.* at 896.

To repeat, the critical finding was that "the hospital reserved no right to control the specific medical techniques employed by the emergency room doctors, but merely exercised a limited surveillance in order to monitor the quality of medical care provided." *id.* at 897, 237 S.E.2d 213. The hospital was insulated from liability.

In *Hollingsworth v. Georgia Osteopathic Hospital, Inc.*, 145 Ga.App. 870, 245 S.E.2d 60, *aff'd* 242 Ga. 522, 250 S.E.2d 433 (1978), an oral contract between the emergency room physician and the hospital obligated the doctor to serve the emergency room one day per month for a twelve hour period; he was reimbursed at a rate of $100 per day. The court observed, "[a]lthough the contract did not set out specific procedures to be used by the physician during the performance of his duties, it did require him to be in attendance at the hospital's emergency room at least once a month and to perform his duties according to the standards then existing in his profession." *Id.* at 871, 245 S.E.2d 60.

There was no indication in the decision that the hospital controlled the doctor's manner and method of diagnosing and treating patients. Yet, following *Hodges*, the *Hollingsworth* court held that the liability of the hospital was a question for the jury.

The foregoing review of the Georgia Court of Appeals' analysis of the doctor-hospital relationship demonstrates that the simple control test expressed in *Blair v. Smith, supra* and espoused in *Pogue* does not provide a simple solution to the dilemma. Undoubtedly, the difficulty with the control analysis is that, if applied routinely, it will always operate to release the employer. Doctors, unlike laborers, are bound to exercise their judgment without interference from others. The Hippocratic Oath requires that the physician "... use [his] power to help the sick to the best of [his] ability and judgment." And Section 6 of the American Medical Association's "Princi-

ples of Medical Ethics" states, "A physician should not dispose of his services under terms or conditions which tend to interfere with or impair the free and complete exercise of his medical judgment and skill ..." *Cf. Mitchell Co. Hospital Authority v. Joiner,* 229 Ga. 140, 141, 189 S.E.2d 412 (1972) (Hospital Authority has no right to exercise any control in the diagnosis or treatment of illness or injury).

Under the control test announced in *Employer's Mutual v. Johnson,* 104 Ga.App. 617, 620, 122 S.E.2d 308 (1961) ("the right to control the manner and method means the right to tell the employee how he shall go about doing the job in every detail, including what tools he should use and procedures he should follow") a hospital would never be liable for the negligence of a physician. Yet, the decisions in *Nickolson, Hodges,* and *Hollingsworth* reveal that the Georgia Court of Appeals has no intention of enshrouding hospitals or other employers of physicians with an impenetrable cloak of immunity. Thus, the court seizes on the basis of pay, and the right of the employer to dictate the hours of work, rather than the employer's right to choose the scalpel to be used or the location of the incision.

In *Harris v. City of Chattanooga,* 507 F.Supp. 365 (N.D.Ga.1980) this Court canvassed nearly fifty decisions of the Georgia appellate courts in an effort to distill the essence of the employee-independent contractor controversy. Although the Court concluded ultimately that the protean concept of control eluded a concise definition, it was apparent that eight separate factors were frequently considered by the Georgia Courts: (1) The right of the employer to make additional plans and specifications; to impose his will in lieu of contractual provisions; and to direct the work step-by-step.[4] There is no controversy that Dr. Schmidt did not in any way control the work performed by Dr. Midani. This factor, then, indicates that Dr. Midani was an independent contractor. (2) Contracts to perform a

service rather than to accomplish a task. The latter are indicative of an independent contractor relationship, the former of an employee-employer relationship. Because Dr. Midani essentially was hired full time by Dr. Schmidt to "cover" the emergency room, i. e., to provide that service, Dr. Midani was Dr. Schmidt's employee. (3) The employer's authority to control the employee's time. Of course, this is one of the factors on which the *Nickolson, Hodges,* and *Hollingsworth* courts relied. Although there are ambiguous statements in the record, Dr. Schmidt certainly exercised some degree of control over the group members' schedule. (4) The employer's right to inspect the employee's work. Dr. Schmidt had no such authority, and Dr. Midani would be classified as an independent contractor under this factor. (5) Who supplies the equipment? Presumably the hospital did, so as between Dr. Schmidt and Dr. Midani, this factor is irrelevant. (6) The right to terminate the contract. The record does not indicate whether Dr. Schmidt could summarily relieve Dr. Midani of his services. (7) The nature or skill of the employee's work. The more skilled the employee, the more likely he is an independent contractor. Dr. Midani would be an independent contractor under this test. (8) The method of payment. If the employee is paid for the entire task performed, this evidences an independent contractor relationship. If, however, as here, the employee is paid by the hour, that exemplifies an employee-employer relationship. Again, this is a factor emphasized by the court in *Nickolson, Hodges,* and *Hollingsworth.*

The doctrine of respondeat superior has its roots in the earliest common law. Prosser, The Law of Torts, § 69, p. 458 *et seq.* (4th ed. 1971). The modern justification reflects the basic economic reality that employers can better absorb the losses occasioned by the negligence of employees:

The losses caused by the torts of employees, which as a practical matter are sure

4. In the *Harris* decision, this Court listed numerous decisions under each of the eight fac-

tors. That will not be repeated here.

to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise which will, on the basis of all past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them ...

Prosser, *supra*, p. 459.

The whole structure of our economic and business practices and institutions puts the employer in a better position than the employee to absorb and distribute these costs.

Harper and James, The Law of Torts, § 26.1 (1956).

To hold Dr. Schmidt vicariously liable for the negligence (if any) of Dr. Midani is consistent with the conceptual premise of the doctrine of respondeat superior. The record in this case reveals that Dr. Schmidt (or the group) profitted from Dr. Midani's service: Dr. Midani was paid less per hour than the group members paid themselves per hour. It would advance the policies inherent in the doctrine of respondeat superior, then, to hold Dr. Schmidt accountable for the damage caused by Dr. Midani.

■ The conflicting decisions of the Georgia Courts in apparently similar factual situations, counsel in favor of submitting this question to the jury. The *Harris* factors enumerated above point in both directions. Prudence compels this Court to hold that the liability of Dr. Schmidt must be decided by a jury. His motion for summary judgment is accordingly denied.

Whether the hospital should also be held vicariously liable depends on different considerations.

The facts of *Overstreet* are strikingly similar to the facts here. The hospital was bound contractually to a party other than the alleged tortfeasor. That party (The Director of Emergency Room Services in *Overstreet*, and the "group" here) engaged the services of the alleged tortfeasor. The

contracts in both cases expressly disavowed any control over the method of diagnosis and treatment. In both cases, the hospital neither paid the tortfeasor directly, nor arranged his schedule. *Overstreet*, then, would appear to warrant a result in favor of the hospital.

■ Nevertheless, an argument has been raised by plaintiff here which apparently was not considered by the *Overstreet* court. It is an argument which this Court finds compelling, and which raises a genuine issue as to a material fact. This question is whether the hospital should be estopped from denying that Dr. Midani was its agent because of Dr. Midani's apparent authority to act as the hospital's agent.

The doctrine of "apparent authority" has firm roots in the jurisprudence of Georgia. *Luckie v. Johnston*, 89 Ga. 321, 15 S.E. 459 (1892); *Fitzgeral Oil Co. v. Farmer Supply Co.*, 3 Ga.App. 212, 215, 59 S.E. 713 (1907) ("If a man holds out another as his agent, and thus induces persons to deal with him as agent, the principal is estopped, as to such third parties, from denying the agency.")

The doctrine was explained in *Folsom v. Miller*, 102 Ga.App. 232, 234, 116 S.E.2d 1 (1960):

A principal is liable for the acts of the agent, within the appearance of the authority he knowingly permits the agent to assume, or holds the agent out to the public as having.... When an alleged principal, by acts or conduct, has knowingly caused or permitted another to appear as his agent, he will be estopped to deny the agency, to the injury of third persons who have in good faith and in reasonable prudence dealt with the apparent agent on the faith of the relationship.

*See also, Gilmore v. Royal Indemnity Co.*, 240 F.2d 101, 105 (5th Cir. 1957) (applying Georgia law); *Armour Fertilizer Works v. Abel*, 15 Ga.App. 275, 279–80, 82 S.E. 907 (1914); *Patterson v. Southern Ry. Co.*, 41 Ga.App. 94, 151 S.E. 818 (1929); *Davis v. Citizens-Floyd Bank & Trust Co.*, 37 Ga. App. 275, 139 S.E. 826 (1927); *Commercial*

*Credit Corp. v. Noles*, 85 Ga.App. 392, 69 S.E.2d 309 (1952).

Two sections of The American Law Institute's Restatement of Law are premised on the doctrine of apparent authority:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Restatement (Second) of Torts § 429.

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Restatement (Second) of Agency § 267.

■ The doctrine of apparent authority is steeped in principles of estoppel. Accordingly, the party attempting to establish another's apparent authority must demonstrate that he *relied*, in good faith, on the principal's and agent's conduct which would lead a reasonable person to believe that a principal-agent relationship in fact existed. *Interstate Financial Corp. v. Appel*, 134 Ga. App. 407, 411, 215 S.E.2d 19 (1975) ("In order for this estoppel to occur it must appear that the third party dealt with the agent in reliance upon the authority which the principal has apparently conferred upon him ...").

Because justifiable reliance must be shown, the paradigmatic case involves a commercial transaction in which the plaintiff (third person) contends that the person with whom he dealt (the agent, usually a non-party) had apparent authority to act on behalf of the principal (defendant). *See e. g., Folsom v. Miller, supra,* (attorney settles case on behalf of client); *Fitzgeral Oil Co. v. Farmers Supply, supra,* (plaintiff purchases goods from defendant's bookkeeper); *Commercial Credit Corp. v. Noles, supra,* (defendant paid off note in full to plaintiff's employee).

In most personal injury actions, the plaintiff has not had an opportunity to rely on the agent's (tortfeasor's) relationship to the alleged principal. As one Court observed,

> [T]here are of course instances in which an ostensible agency may be created by permitting a person to drive a truck under [certain] conditions, but it cannot reasonably be contended that a motorist would be more likely to wish to collide with a truck bearing the insignia of [Texaco] than with one bearing any other insignia.

*Duvall v. T.W.A.*, 98 Cal.App.2d 106, 219 P.2d 463, 470 (1950).[5] *See also, Apple v. Standard Oil, Division of American Oil Co.,* 307 F.Supp. 107 (N.D.Cal.1969) (plaintiff's son bitten at gas station which sold the gas of defendant, but was not owned by defendant); *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 370 A.2d 554 (1977) (similar to *Apple, supra*).

Nevertheless, despite the relative dearth of personal injury cases in which the doctrine of apparent authority plays a role, the Court has found a number of cases where the doctrine has been invoked in a factual situation similar to that presented here. The doctor-hospital relationship is unique, in this respect, because a patient does rely on the apparent relationship when he decides to seek medical assistance from a hospital. As one Georgia court recognized, "a hospital, by its very nature, holds itself out as competent, through its employees, to care for the sick and the injured..." *Hospital Authority of Hall County v. Adams*, 110 Ga.App. 848, 853, 140 S.E.2d 139 (1964).

---

**5.** But see, *Buchanan v. Canada Dry Corp.*, 138 Ga.App. 588, 226 S.E.2d 613 (1976) where the court avoided the reliance requirement in an auto accident case by raising the issue of "alter ego," an approach which focuses on the economics of the relationship rather than its appearance to third parties.

In *Brown v. Moore*, 247 F.2d 711 (3rd Cir. 1957), the Court held that the negligence of a doctor (even if he were an independent contractor) was attributable to the hospital because of the doctor's apparent authority to act as the hospital's agent. Numerous factors justified the plaintiff's belief that the doctor was an agent of the hospital: The patient signed a release permitting the hospital to administer necessary treatment; an indemnification agreement referred to the plaintiff as a patient of the hospital; a bill was submitted to the patient by the hospital; and the hospital collected the bills (the court labelled this factor "peculiarly pertinent" *id.* at 721). With these facts, the court held that it was certainly reasonable for the jury to find that the doctor was the apparent agent of the hospital.

In *Stanhope v. Los Angeles College of Chiropractic*, 54 Cal.App.2d 141, 128 P.2d 705 (Cal.1942), similar considerations led the court to hold the College liable for the negligence of the x-ray technician who was an independent contractor:

> So far as the record reveals appellant did nothing to put respondent on notice that the x-ray laboratory was not an integral part of appellant institution, and it cannot seriously be contended that respondent, when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him were employees of the college or were independent contractors.

*Id.*, 128 P.2d at 708.

The reasonable expectations of a patient were examined in *Arthur v. St. Peters Hospital*, 169 N.J.Super. 575, 405 A.2d 443 (1979):

> This court may take judicial notice that generally people who seek medical help through the emergency room facilities of modern-day hospitals are unaware of the status of the various professionals working there. Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while there, it is the reputation of the

hospital itself upon which he would rely. Also, unless the patient is in some manner put on notice of the independent status of the professionals with whom it might be expected to come into contact, it would be natural for him to assume that these people are employees of the hospital.

405 A.2d at 447. The court concluded that "[a]bsent notice to the contrary, therefore, plaintiff had the right to assume that the treatment received was being rendered through hospital employees and that any negligence associated with that treatment would render the hospital responsible." *id.*

A similar analysis and conclusion led the court to impose liability on the hospital in *Mduba v. Benedictine Hospital*, 52 A.D.2d 450, 384 N.Y.S.2d 527 (Sup.Ct.1976):

> The decedent entered the hospital for hospital treatment. The defendant hospital undertook to treat decedent for a charge and furnished the doctors and staff to render that treatment.... Patients entering the hospital through the Emergency Room could properly assume that the treating doctors and staff of the hospital were acting on behalf of the hospital. Such patients are not bound by secret limitations as are contained in a private contract between the hospital and the doctor. Defendant held itself out to the public offering and rendering hospital services.

384 N.Y.S.2d at 529.

Finally, in *Mehlman v. Powell*, 281 Md. 269, 378 A.2d 1121 (1977), the court also refused to bar recovery against a hospital on the basis of the independent contractor relationship between the emergency room physician and the hospital:

> The Hospital ... is engaged in the business of providing health care services. One enters the hospital for no other reason. When Mr. Powell made the decision to go to Holy Cross Hospital, he obviously desired medical services and equally obviously was relying on Holy Cross Hospital to provide them. Furthermore, the Hospital and the emergency room are located in the same general structure.... In

the instant case, all appearances suggest and all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution. It is not to be expected, and nothing put Mr. Powell on notice, that the various procedures and departments of a complex, modern hospital like Holy Cross are in fact franchised out to various independent contractors.

*Id.,* 378 A.2d at 1124.

The parties have not submitted any evidence on this issue, except, perhaps, with respect to the billing procedure. If the Sam Howell Memorial Hospital cloaks the emergency room doctors with the vestments of an agent, then a jury may well conclude that Mr. Ronald Stewart relied on the hospital and its apparent agents to provide the critically needed diagnosis and treatment. If the jury finds that Dr. Midani was negligent in his diagnosis and treatment, then the hospital may be held liable as if Dr. Midani were an employee.

The implications of this decision are not necessarily far-reaching. A hospital would not be held liable for the negligence of a doctor (whether on staff or not) if the patient was aware of the actual relationship between the doctor and the hospital. As the court in *Arthur* suggested, a simple notice might suffice to inform the prospective patient that the emergency room (or x-ray laboratory) is under the control of an independent contractor. Furthermore, the patient could not sue the hospital if the negligent doctor was the patient's personal physician who was obviously simply using the hospital facilities. *See e. g., Schwartz v. Boston Hospital For Women,* 422 F.Supp. 53 (S.D.N.Y.1976). The *Brown v. Moore* court distinguished that type of situation, "There was not the 'immediate and unbroken relationship between a professional man and those who engage his services' [which is] essential to maintain the doctor-patient relationship." Without that clearly defined relationship, a jury could find that the patient engaged the services of the hospital, and, under certain circumstances, that

the patient is entitled to recover from the hospital for the negligence of the doctor. The critical question is whether the hospital nurtures the patient's belief (if even by mere acquiescence) that the doctor is the hospital's agent.

The Court is not unmindful of its *Erie* duty. There appear to be no cases in Georgia where a hospital was held liable for the negligence of an independent contractor on the theory of apparent authority. Yet, as already shown, the doctrine of apparent authority is deeply rooted in this state's jurisprudence. There is nothing antithetical about applying the estoppel rule to the doctor-hospital relationship, as evidenced by the numerous cases cited from other jurisdictions. If a Georgia court were presented with this argument, it would be necessary to overrule or disregard a substantial number of cases to justify the granting of summary judgment for the hospital. This Court cannot anticipate a wholesale reversal of such settled law.

ACCORDINGLY, the motions for summary judgment are DENIED.