**JAMES TALCOTT, INC., Appellant,**

v.

**Herschel CARDER, Appellee.**

**No. 19103.**

United States Court of Appeals
Fifth Circuit.

March 20, 1962.

Emory F. Robinson, Robert B. Thompson, Wheeler, Robinson & Thompson, Gainesville, Ga., for appellant.

Joe K. Telford, Telford, Wayne & Smith, Gainesville, Ga., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

Talcott sued Carder on a promissory note in the principal amount of $13,-500.00 payable to the order of Chemell's Hatchery, Inc., and assigned to Talcott, purporting to be signed by Hershall Carter. It will be noted that the maker's signature was Hersh*all* Car*ter* rather than Hershel Car*der*, the name of the defendant. Carder answered that he did not sign the note sued on and did not authorize anyone to sign that note or any other note or obligation to Chemell's Hatchery, Inc.

Talcott amended its complaint to aver that Carder is estopped to assert that defense because he had signed and caused to be transmitted to Talcott the following statement:

"Francis J. Palamara & Co.
Accountants and Auditors
P.O. Box 430, Cooper Station,
New York 3, N. Y.
Hershall Carter
Suches,
Ga.

Following is a statement of your account at 3–31–59 with Chemell's Hatchery, Inc.

This statement is sent for comparison and is not a request for payment of invoices not due.

If the statement is correct, will you please confirm by signing on the line below and return it to us in the enclosed envelope.

If the statement is Not correct, please give us full details of any differences, counterclaims, offsets or special conditions as to payment.

Yours very truly,
FRANCIS J. PALAMARA
& CO.

Second Request.
1959

Please verify the following notes:
Dates—Due—Amount.
March 17—December 17, 1959—13,500.

We cannot complete our audit without your reply. Thank you.

The above statement is correct.
HERSHEL CARDER,
(Signature).
Suches, Ga. May 12, A.M. 1959

Postage Will be Paid by Addressee.
(Stamps)
Business Reply Envelope.
First Class Permit No. 57418,
New York, N. Y.
Francis J. Palamara & Co.
P. O. Box 430
Cooper Station
New York 3, N. Y."

Talcott alleged that it had relied and acted upon that representation to its injury and disadvantage. Carder answered admitting that he had signed the document but denying all other allegations of the amendment.

The note sued on showed on its face that it was given for "the purchase price of 15,000 pullets at $.75." Carder testified that he did not sign the note nor authorize anyone to sign it, and had neither bought the pullets from Chemell's Hatchery, Inc., nor had any dealings with Chemell's Hatchery, Inc., concerning them. There was no testimony to the contrary. Carder admitted signing the verification document relied on in the

amendment and mailing it back to Francis J. Palamara & Co.

The district court denied the motion of the plaintiff Talcott for a directed verdict and submitted the case to the jury upon full instructions, concluding as follows:

> "Now, if you are convinced that this Defendant has knowingly, or grossly negligently misled the Plaintiff in this case, and that they have acted to their injury, and the Defendant is liable to the Plaintiff, then your verdict in this case should be a verdict for the Plaintiff for the amount sued for. If on the other hand, you are convinced that the Defendant in this case has not been negligent and that he did not sign the note, and you are convinced of that, and you think that the evidence by a preponderance thereof establishes that fact, then of course you should find for the Defendant."

The jury returned a verdict for the defendant Carder, and from the judgment entered upon that verdict, this appeal is prosecuted. The sole question presented is whether the district court erred in denying the motion of the plaintiff Talcott for a directed verdict.

The note, along with four other notes, was assigned by Chemell's Hatchery, Inc., to Talcott in March 1959. The aggregate face value of the five notes was $42,711.00 for which Talcott paid to Chemell's Hatchery $34,168.80 calculated as 80% of the face value of the notes. The total amount of advances or purchases of securities from Talcott to Chemell's Hatchery, Inc., ran into hundreds of thousands of dollars, all at substantial discounts. No payment was ever made on the note. Chemell's Hatchery, Inc., went into bankruptcy sometime after May of 1959, the exact date not appearing.

The purported verification of the note by the defendant Carder appeared by rubber stamp to be a "SECOND REQUEST." The envelope returning that verification to Francis J. Palamara & Co. was postmarked May 12, 1959. Before that time, Talcott had already purchased the worthless note. The vice president of Talcott claimed that it had been injured by the erroneous verification of the note in the following manner:

> "This particular request for verification was the second request, and had there been no reply to this we would have had somebody investigate. One of our auditors or someone out of our Atlanta office, or by telephone. Now, had,—Receiving this, we merely filed it away and marked the account as Okey. Had we received this reply back and had the reply stated that the note was not a bona fide note, that he did not owe the money, we would have immediately had one of our men from the Atlanta office come up to Gainesville, or to Suches and check into this matter, and if we had found at that time that was a fraudulent note we would have immediately called our loan with Mr. Chemell and saved ourselves perhaps two hundred and fifty thousand dollars."

The defendant Carder testified that he did not intend to mislead the plaintiff Talcott or anybody else; that when he received the first confirmation notice from Palamara & Co. he threw it away; that when he received the second request, he telephoned to Barker & McMillan Hatchery, which had delivered to him in March 1959 some 16,000 or 17,000 chicks to be grown into broilers, and asked the man who answered the phone what that paper was, and "he said it was a — verified that I was growing chickens." After that advice, Carder signed the confirmation and mailed it in the enclosed envelope to Palamara & Co. Carder testified that he did not understand that he was acknowledging a debt or a note, but, "I guess I just figured it was something about chickens."

There is no dispute but that the signature on the verification is entirely different from the signature on the note. Talcott's vice president testified:

> "Q. Will you look at that verification, the signature on it, and will you

compare the signature on the statement that came back with the signature on the note. A simple comparison will show that they are not the same, won't they Mr. Keller?

"A. That is true.

"Q. And anyone looking at one and looking at the other, together, could see that they are not the same?

"A. That is correct."

The evidence was clear and undisputed that the note sued on was not executed by the defendant Carder. The only theory on which it is claimed that he became liable is by equitable estoppel, which in Georgia can be predicated upon gross negligence:

"38–116 *Equitable estoppel.*—In order for an equitable estoppel to arise, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury." Georgia Code Ann., Title 38.

■ The general rule is that for an estoppel by misrepresentation to arise the false representation must be made to the person seeking the benefit of the estoppel or intended for communication to that person. 31 C.J.S. Estoppel § 78, n. 84. As said by the Supreme Court of Georgia in Parker v. Crosby, 1920, 150 Ga. 1, 102 S.E. 446, 448:

"It might well be that one making declarations to one against his own title would not make such declarations to a third person; and as estoppels are not favored by our law, in order for declarations, amounting to an estoppel, to be binding, it must

appear that they were made to the person for whom they were intended, or to some one for him."

■■ There was no evidence that the defendant Carder actually intended to deceive anyone. His conduct in signing the verification was negligent, and, arguendo, we may assume that it was grossly negligent as a matter of law.[1] Nonetheless, the district court properly denied the motion of the plaintiff Talcott for a directed verdict for several reasons: (1) It was for the jury to say whether Carder was charged with any notice that his statement to Palamara would be communicated to and acted on by Talcott or any other person. The purpose and importance of the information requested could have been explained much more clearly in the request. (2) It was for the jury to say whether Talcott was not itself negligent in failing to compare the signature to the verification with the signature to the note. If not otherwise required, in this case the clear difference in spelling of the names may have called for the exercise of that much care. If Talcott had made that comparison, it would have discovered that the note was not executed by Carder. Talcott may not base a claim of estoppel on its own dereliction of duty. 31 C.J.S. Estoppel § 75, p. 281. (3) The evidence of Talcott's injury was at best a matter of inference or conjecture, and it was for the jury to say whether Talcott actually did suffer any injury in reliance upon the verification. It follows that whether or not the question of gross negligence on the part of Carder was for the jury, the motion of the plaintiff Talcott for a directed verdict was properly refused. The judgment is

Affirmed.

1. "105–203 *Slight Diligence, Gross Negligence.*—

"In general, slight diligence is that degree of care which every man of common sense, howsoever inattentive he may be, exercises under the same or similar circumstances. Applied to the preservation

of property, slight diligence means that care which every man of common sense, howsoever inattentive he may be, takes of his own property. The absence of such care is termed gross negligence." Georgia Code Ann., Title 105.