APCOA, INC. and Federal Insurance Company, Plaintiff,

v.

FIDELITY NATIONAL BANK, Defendant and Third–Party Plaintiff,

v.

Dolly ISON, a/k/a Dolly Medlin, a/k/a Dolly Medley, Third–Party Defendant.

No. 1:86–CV–1990–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 19, 1988.

Dorothy Yates Kirkley, James Allen Orr, Paul Hastings Janofsky & Walker, Charles David Hailey, John Phillip MacNaughton, Swift Currie McGhee & Hiers, Atlanta, Ga., for plaintiff.

James Joseph Brissette, Hurt Richardson Garner Todd & Cadenhead, Atlanta, Ga., for defendant and third-party plaintiff.

## ORDER

ROBERT H. HALL, District Judge.

This case comes before the court on plaintiff's motion for summary judgment. Plaintiff's claim in this case results from an embezzlement scheme whereby an employee or employees of plaintiff's company managed to embezzle several hundred thousand dollars. The embezzler opened accounts at defendant bank in plaintiff's name, deposited checks payable to plaintiff corporation (which he or she had intercepted from plaintiff's office) into those accounts, then drew on those accounts for her own personal use. Plaintiff claims that the Bank is liable for the amount embezzled as a matter of law. The court finds that their are no genuine disputes as to material facts and the plaintiff is entitled to summary judgment.

## FACTS

The Plaintiff ("APCOA"), is a Delaware corporation with its principal place of business in Cleveland, Ohio. APCOA is in the business of managing parking facilities throughout the United States. At all times pertinent to this case APCOA maintained a field office in Atlanta, Georgia through which it managed those parking facilities it held in Atlanta. In order to facilitate the transfer of funds from APCOA's Atlanta field office to APCOA's home office in Cleveland, Ohio, APCOA maintained "depository accounts" with local Atlanta Banks. All parking lot revenues collected by APCOA's Atlanta office were to be deposited into APCOA's authorized depository accounts. Officers of the corporation in Ohio would then withdraw the funds to Cleveland where the main corporate accounts were held. The Atlanta office did not maintain any corporate accounts for the payment of expenses. Payroll, rent, equipment, etc ... were all drawn on APCOA's central accounts in Cleveland.

There are basically four individuals at APCOA who have played significant roles in the subject matter of this litigation. The district manager in APCOA's Atlanta office during the relevant period was Victor Toledo. He was in charge of the Atlanta operations and the office in general. He reported to the then Vice President and regional manager Walter Stuelpe, who also operated out of the Atlanta office during the relevant period but was not involved in the day-to-day operations of the Atlanta parking facilities. Stuelpe was actually a corporate person from Cleveland stationed in the Atlanta office. Among the employees Toledo supervised in Atlanta were Dolly Ison and William Jones. Ison, the central figure in the embezzlement scheme, was hired initially as a receptionist, she then was promoted to Toledo's secretary and eventually assumed the role of bookkeeper and office manager for APCOA's Atlanta operations. Jones' title was City Manager and he was responsible for supervising the Atlanta parking lot operations.

In early 1982, APCOA was conducting its banking business with Citizens and South-

ern National Bank (C & S) in a branch located in Peachtree Center. Stuelpe became dissatisfied with APCOA's relations with C & S, and sent Toledo and Jones to explore the possibility of shifting APCOA's banking from C & S to Fidelity National Bank. In the early summer of 1982, after reviewing what services Fidelity could offer, the decision was made to change APCOA's accounts over to Fidelity.

On or about June 23, 1982 Jones opened the first account at Fidelity under the name "APCOA, Inc. Petty Cash Account." As authority for this account Fidelity gave Jones [1] a form for unincorporated associations. He filled out this form calling the association "APCOA, Inc. Petty Cash Fund" and referring to himself as the proprietor and Victor Toledo (his boss) as a second authorized signature for the account. This account was handled by Jones and was used simply to hold the office's petty cash fund so that Jones would not have to keep large amounts of cash in his office. Toledo, Jones and Ison testified at their depositions that the home office in Cleveland must have known about this account. However, there is no evidence in the record whether or how the main office was informed, and Stuelpe emphatically insisted that the home office was never aware of this account at Fidelity. Though Jones testified that he considered the funds to belong to APCOA, the money in that fund was exclusively under Mr. Jones' control. Jones used the fund to pay for incidental office expenses, and when he incurred such expenses he would inform the main office and Cleveland would reimburse him so that the fund stayed at a constant level.

The next two accounts opened at Fidelity were the accounts to which APCOA deposited its parking revenues, the "depository accounts". These accounts were opened on or about August 2, 1982, pursuant to corporate authorizations from Cleveland. The depository accounts were governed by certain documentation forwarded to Fidelity from APCOA's Cleveland office at or about the time the accounts were opened. This documentation included two Designation and Authorization forms signed by the treasurer of APCOA, two Certificates and two signature cards.

The Designation and Authorization forms provided that Fidelity was authorized to pay checks on drafts "made or drawn against any funds at any time standing to the credit of [APCOA] in any account carried under the name of [APCOA]" when the checks and drafts were signed by two of the four designated individuals. The signature cards prepared in connection with these accounts contained the signatures of three officers of APCOA and Philip F. Milavek—without title—all based in Cleveland. No employee of APCOA in Atlanta was listed as an authorized signatory on these accounts. All statements and other documentation on these APCOA depository accounts were to be mailed directly to APCOA's home office in Cleveland.

Both the Designation and Authorization form, and the Certificate provided that they were to "continue in full force and effect until the express written notice of the revocation or modification of the same shall have been received by [Fidelity]." The Designation and Authorization forms, the Certificates and the signature cards were all filed and maintained at Fidelity's branch office in Peachtree Center.

The fourth account was opened at Fidelity on or about August 10, 1982 and was called "APCOA, Inc. Refund Account". There were apparently no authorizations from APCOA for this account. Ison opened the account at Toledo's direction to handle refunds for key cards or overpayments. The account was never to contain more than $50, and apparently was never used for illegitimate purposes. Again Toledo and Ison claim the home office must have known about this account but Stuelpe denies that he or the home office had any knowledge of such an account. Stuelpe asserts that accounts such as this were contrary to company policy and would not have been allowed if discovered. The signatories on the Refund account were Ison, Toledo and Toledo's wife

---

1. It is disputed whether Toledo was involved in   the opening of this account.

Joanne who was his secretary at the time the account was opened.

On September 18, 1982 Dolly Ison opened an account at Fidelity entitled "APCOA—Special Account". This was the first account used for the embezzlement. The account was opened by Fidelity employee Doris Moore. There were no corporate resolutions, authorizations, or certificates executed by any officers or authorized officials of APCOA in connection with the opening of this Special Account. The signature card for this account listed Victor Toledo and Dolly Ison as authorized signatories. The mailing address was APCOA's local mailing address in Atlanta. There is no evidence that Cleveland ever became aware of this account until the defalcation was discovered. In March of 1983 the mailing address on the Special Account was changed to a post office box that was not maintained in the name of APCOA.[2]

On or about May 16, 1983, Dolly Ison closed the Special Account and opened a second unauthorized account at Fidelity. The second account was entitled "Dolly Ison for APCOA." Apparently, the "for APCOA" was added by Fidelity employee Doris Moore. Again there were no corporate resolutions, certificates of authority or other authorization forms or documents executed by APCOA or anyone in connection with the opening of the Ison for APCOA account. All bank statements and other documents relating to the account were mailed to a post office box which was not maintained by APCOA.

Dolly Ison walked into Fidelity's Peachtree Center branch and without forms, documents or any evidence of authority opened two accounts in APCOA's name. Mr. Sharon Denney, the Branch Manager of Fidelity's Peachtree Center branch testified that authorizations were not obtained because the bank already had authorizations on file for APCOA. There is no dispute that those documents do not authorize

Dolly Ison or Victor Toledo to withdraw funds from APCOA's account.

Doris Moore who opened both the Special Account and the Ison for APCOA account was aware of the existing depository accounts and was aware that certain documentation had been executed in connection with those accounts. Doris Moore also knew that the Ison for APCOA account had nothing to do with the parking lots managed by APCOA and further understood that none of the checks which represented APCOA's parking lot revenues were to be deposited into this account.

From September of 1982 through January of 1985, Dolly Ison converted $259,611.85 in parking lot receipts from APCOA by depositing checks payable to APCOA in these two accounts and then withdrawing money by writing checks on the account. There is a great dispute as to whether Ms. Ison carried out this scheme alone or whether Victor Toledo and others were involved. However, Toledo's involvement is not relevant to Fidelity's liability based on the undisputed facts presented in the record.

The checks which were deposited in the Special Account and the Ison for APCOA account were taken from the monthly parking payments which were either brought or mailed to APCOA's Atlanta office by its customers. These checks were made out "Pay to the order of APCOA" and were intercepted by either Dolly Ison or Victor Toledo. The checks were then endorsed either by a stamp which read "For deposit only" or a combination of the words "For deposit only" and "APCOA" hand written on the back of the check. The checks were deposited directly into the unauthorized accounts.

All of the checks written on the Special Account and the Ison for Apcoa account bore the single signature of Dolly Ison.

---

**2.** There are troubling factual questions concerning whether Toledo was involved in opening this account and/or participated in the embezzlement scheme. Toledo apparently signed the signature card for the Special Account, however, he has testified that he was unaware that an account was being opened. However, the court finds that Toledo's involvement is irrelevant to Fidelity's liability in this situation.

## DISCUSSION

This case involves a situation in which at least one person, perhaps many, abused positions of trust; it involves dishonesty, trickery and unfortunately large sums of money. Dolly Ison is now incarcerated in West Virginia for her activities in the APCOA embezzlement and others have lost their jobs or their good reputations since the defalcation was discovered. The question before this court is whether Fidelity, the banking institution involved, may be held responsible for the loss APCOA suffered as a result of the embezzlement by its employees.

Fidelity is responsible for three acts which basically provided the system through which the embezzlement was carried out: 1) the opening of the two unauthorized accounts, 2) the deposit of checks payable to APCOA into these accounts and 3) the acceptance of checks written on these accounts on the single signature of Dolly Ison. If Fidelity had prevented any one of these events, the embezzlement scheme would have been thwarted.

■ The heart of APCOA's case rests upon Fidelity's mismanagement of funds given to it which were made payable to APCOA. The Designation and Authorization forms which have become a centerpiece of this litigation and are exhibits to almost every deposition are primarily concerned with how Fidelity should handle any funds which it holds that belong to APCOA. If viewed independently, all of Fidelity's actions might may have been justified, but when taken together the Bank's activities evince a drastic departure from the guidelines established in the documents APCOA submitted to the bank as well as a material breach of basic fiduciary duties. The court will analyze each step the Bank took in view of its overall responsibility for handling APCOA's funds, then discuss Fidelity's defenses to plaintiff's claims.

### Opening the Accounts

■ A bank account in and of itself is quite harmless. Embezzlement occurs when a bank account is used in a particular manner—when funds are improperly deposited into or withdrawn from an account. If Bank A opened an "unauthorized" account for "ABC" corporation, but no money was ever deposited into or withdrawn from that account it is unlikely that "ABC" would have a cause of action against Bank A. Therefore, the rules regarding the opening of bank accounts are promulgated primarily by the banks themselves. The court agrees with Fidelity that a bank's failure to follow its own internal operating procedures cannot give rise to legal liability. It also agrees with the defendant's interpretation of the language in *Trust Company v. Nationwide*, 235 Ga. 229, 219 S.E.2d 162 (1975). The court in *Trust Company* stated:

> "while we agree the bank could easily protect its interest by requiring a proper corporate resolution showing the agent's authority to act for the corporation, that method is not the exclusive one for establishing the existence either of authority or of inherent agency power to open a bank account for the corporation."

235 Ga. at 233, 219 S.E.2d 162.

The absence of a corporate resolution does not establish defendant's liability. Requiring a corporate resolution before opening an account is a way for the bank to protect itself from liability for mishandling funds deposited to the credit of a corporation. A bank only incurs liability when it allows individuals access to corporate funds when they have no "authority" or "inherent agency power".

For whatever reason, Fidelity did not require documentation when it opened the Special Account and the Ison for APCOA account (the "unauthorized accounts"). It seems that Doris Moore thought the accounts were "office" accounts which were not to hold corporate revenues:

A: Actually this would not have really been a corporate account. It would have been for the office, but it was not for APCOA ... It was not for the company itself.

Q: Okay.

A: See, it was—this was not, really, set up to be a corporate account. It was

just for petty cash office supplies. It had nothing to do with the parking lot ...

\* \* \* \* \* \*

Q: And no monies for the parking lot business of APCOA were to be deposited into that account?

A: That's right. That's right.

Moore Depo. at 96–97. This is most likely why Ms. Moore did not require corporate documentation. Sharon Denney, Branch manager at Fidelity's Peachtree Center branch when the accounts were opened, apparently thought they were corporate accounts which were governed by the documents already on file from APCOA:

Q: ... With regard to these two accounts [the Special Account and the Ison for APCOA account] do you feel like corporate resolutions and deposit agreements should have been executed in connection with those accounts?

A: It is my belief that we can rely on a corporate resolution for more than one account.

\* \* \* \* \* \*

Q: Well, I'm not sure whether your answer is that you feel like it was okay not to have a deposit agreement and corporate resolutions because you already had some on file, or you feel they just weren't necessary for some other reason.

A: Well, it appears that we already had some on file. We already had some on file for earlier accounts ...

Denney Depo. at 49–52.

If Ms. Moore had been correct then parking revenues should never have been deposited into those accounts. If Sharon Denney was right and this was simply an additional depository account, then the funds should never have been released upon Dolly Ison's signature. In support of its opposition to Plaintiff's motion for summary judgment, Defendant has submitted the affidavit of Jimmy Tallent. Mr. Tallent opines that Fidelity acted reasonably in opening the accounts in question. This however is not particularly helpful to defendant's case. As shown above even if the defendant can justify the opening of these accounts it cannot square its subsequent handling of the accounts with any rationale for opening them. It was Fidelity's actions after the accounts were opened that forms the basis of this lawsuit.

*The Deposits*

The checks which were deposited into these "unauthorized" accounts were all made payable to APCOA. The embezzler endorsed the checks by either stamping them "For deposit only" with the company stamp or writing a deposit endorsement on the back of the check. When those checks were deposited with Fidelity they stood to the credit of APCOA. They were made payable to APCOA and endorsed by APCOA. Regardless of what account they were deposited into there is no question that after the bank accepted those checks they were funds which stood to the credit of APCOA.

■ If Fidelity takes the position Ms. Moore's testimony seems to suggest that these unauthorized accounts were not corporate accounts, then parking lot revenues made payable to APCOA should never have been deposited into these accounts. If they were not APCOA accounts then Fidelity accepted funds for deposit over a restrictive endorsement and is liable for all deposits so accepted. O.C.G.A. §§ 11–3–205 and 11–3–206.

■ If they were APCOA accounts, as Mr. Denney's testimony suggests, then the funds stood to the credit of APCOA and they were governed by the documents which formed the basis of APCOA's and Fidelity's banking relationship.

*Withdrawals from the Unauthorized Accounts*

■ Under Georgia law the relationship between a bank and its depositor is contractual in nature. *Washington Loan and Banking Co. v. Mitchell*, 162 Ga.App. 749, 292 S.E.2d 424 (1982). When a bank accepts money for deposit in the name of the depositor, the bank becomes a debtor of the depositor as to those funds. In order

to discharge itself of this liability, the bank must pay the money deposited to either the depositor or to some person to whom he or she directs. *Fulton National Bank v. Didschuneit*, 92 Ga.App. 527, 88 S.E.2d 853 (1955).

Fidelity was contractually bound to handle and administer all APCOA funds in a manner consistent with the terms of their depository contract. APCOA has submitted to this court several documents which outline the conditions of this contractual relationship: Two Designation and Authorization forms, two Certificates and two signature cards. Defendant has offered no reason why these documents should not be accepted on their face as evidence of the agreement between Fidelity and APCOA. The Designation and Authorization form reads in part:

The aforementioned depository is hereby authorized to honor and pay any and all checks and drafts made or drawn against *any* funds at *any* time standing to the credit of the corporation in *any* account carried under the name of the said corporation when signed manually by any two of the following persons:

Anthony C. Frate—President

William J. Montie—Secretary

Anthony M. Gentile, Jr.—Treasurer

Philip F. Milavek, Jr.—Without Title

[emphasis added]. The Designation and Authorization form also provides that the agreement will continue in full force until express written notice of modification or revocation is received by the depository.

Under the clear and unambiguous terms of the documents APCOA submitted to Fidelity, Fidelity was not authorized to pay checks drawn against *any* funds deposited to the credit of APCOA, in *any* account carried in APCOA's name unless the check contained two of the four designated signatures. Fidelity's suggestion that these documents cover only the depository accounts is plainly inconsistent with the language of the document. There is no dispute that Fidelity paid funds out of the two unauthorized APCOA accounts on the single signature of Dolly Ison. A bank's duty to follow the terms of a written corporate resolution submitted by a depositor is so clear that failure to do so is per se improper making summary judgment appropriate. *German Educational Television Network*, 109 App.Div.2d 684, 487 N.Y.S.2d 26, 40 U.C.C.Rep. 997 (1985).

## DEFENSES

Defendant has asserted basically three defenses to plaintiff's breach of contract claim: 1) a modification/ratification or estoppel defense and 2) a statutory defense provided by UCC § 3–419(3) and 3) a statutory defense provided by UCC § 4–406.

### I. *Modification/Ratification or Estoppel*

APCOA opened a total of six accounts with Fidelity: two were the authorized depository accounts, two were the unauthorized embezzlement accounts, and two, the Refund account and Petty Cash account, were opened for incidental office expenses. The last two have created some difficulty in understanding APCOA's general banking policies and form the basis for Fidelity's estoppel defense. APCOA claims that it had a strict policy against field offices maintaining accounts other than the depository accounts at local banks. Construing the facts most favorably for the non movant, *Clemons v. Doughtery Co., Ga.*, 684 F.2d 1365, 1369 (11th Cir.1982), there is a factual question as to whether the Corporate office of APCOA in Cleveland was aware that these two accounts had been opened.

Defendant argues that APCOA gave Dolly Ison apparent authority to open these "unauthorized" accounts and to withdraw money from APCOA funds. Fidelity asserts that plaintiff's conduct in acquiescing to Ison's signature on the Refund account should estop them from asserting that she had no authority to open and draw funds from the unauthorized accounts. Since the court has held that the Designation and Authorization forms govern the funds which were withdrawn in this case, even if Ison had apparent authority, that cannot overcome the express language of the documents in Fidelity's possession which grant her no authority. The defend-

ant failed to examine the depository agreement which expressly declares who has banking authority for APCOA. A party may not base a claim of estoppel on his own dereliction of duty. *James Talcott, Inc. v. Carder*, 300 F.2d 654 (5th Cir.1962) (Discussing estoppel under Georgia law the court held that an individual who had access to an authorized signature and did not compare it with an obviously different unauthorized signature could not rely on estoppel). Nor may an individual claim estoppel by conduct when both parties have equal knowledge or equal means of obtaining the truth. *Cable Holdings v. Lookout Cable Services*, 178 Ga.App. 456, 343 S.E. 2d 737 (1986).

▮ Defendant also argues that since the Refund Account and the Petty Cash Account were silently accepted by APCOA, the requirements of the depository agreement were modified and/or APCOA ratified Ison's authority to sign checks. This argument fails for three reasons.

### 1. Modification must be in writing

▮ The documents at issue in this case specifically provide that any modification or revocation of the agreement must be made in writing. Certainly Fidelity cannot argue that Toledo', Jones' or Ison's writings were sufficient to modify the authorized documents. It is elementary contract law that only parties to an agreement may modify it. *Gaulding v. Courts*, 90 Ga.App. 472, 83 S.E.2d 288 (1954). Fidelity has not shown the court any written modification from APCOA of the authorized signatories on APCOA's corporate accounts.

### 2. The Refund and Petty Cash Accounts were not Corporate Accounts

When William Jones opened the petty cash account he used a form for unincorporated associations, called the association the APCOA Petty Cash Fund and referred to himself as the proprietor. Defendant has shown the court no evidence that the refund account was a corporate account. Though Jones of course expected that the money in that account belonged to APCOA that is not the same as calling them corpo-

rate funds. That money was obviously used to pay for office expenses and no revenues generated from the parking business were ever distributed into this account. Finally, only Jones and Toledo appeared on that signature card so that even if this was a corporate account that APCOA was aware of, it could have in no way given Ison authority to withdraw funds.

Secondly, defendant relies on the opening of the Refund account which Toledo authorized and for which Victor Toledo, his wife Joanne Toledo and Dolly Ison signed the signature card. This account, like the petty cash account, was not to hold corporate funds. The Refund account was opened so that the office could refund overpayments and never had more than $50. Corporate funds were never deposited into this account. Ison's authority to open non-corporate accounts does not bestow upon her apparent authority which would modify specific directions to the contrary.

### 3. Apparent Authority Requires Reliance

▮ Fidelity's defense rests upon the fact that if APCOA's home office allowed Toledo and Ison to Open the Refund account then they modified the depository agreement and vested Toledo and Ison with apparent authority as authorized agents. Under Georgia law a party attempting to establish another's apparent authority must demonstrate that he or she relied in good faith on the *principal's* and the agent's conduct which would lead a reasonable person to believe that a principal-agent relationship existed. *Stewart v. Midani*, 525 F.Supp. 843 (N.D.Ga.1981) (Ward, J.). It must appear that the third person dealt with the agent in reliance upon the authority granted by the principal's conduct. *Interstate Financial Corp. v. Appel*, 134 Ga. App. 407, 411, 215 S.E.2d 19 (1975). The Bank could not rely on Ison's or Toledo's actions to establish authority. *Shivers v. Barton & Ludwig*, 164 Ga.App. 490, 296 S.E.2d 749 (1982). And Fidelity had no way of knowing of much less relying on APCOA's actions. All of the documentation for the refund account was sent to the Atlanta office. The party asserting ratification has the burden of coming forward

**1562**

with evidence showing it relied on the apparent authority granted by the principal. Fidelity has shown no facts suggesting that when it allowed Ison to open the two unauthorized accounts or withdraw money from those accounts that it knew of or relied on APCOA's knowledge of the refund account. There is no evidence showing that Fidelity relied on APCOA's acquiescence to the existence of the Refund Account to open the Special Account or the Ison for APCOA account.

## II. *Commercially Reasonable Conduct*

■ Fidelity next claims that summary judgment is not appropriate because the Uniform Commercial Code provides a defense to a conversion claim if the Bank acted in a commercially reasonable manner. O.C.G.A. § 11–3–419 provides in part:

(3) Subject to the provisions of this title concerning restrictive endorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

Fidelity asserts that it acted in a commercially reasonable manner in all aspects of its dealings with APCOA's funds. The court finds that allowing Dolly Ison to withdraw APCOA funds considering the information available to Fidelity was not commercially reasonable conduct. Defendant relies on *Trust Company of Georgia Bank v. Port Terminal*, 153 Ga.App. 735, 266 S.E.2d 254 (1980), in which the Georgia appeals court reversed the trial court which had granted summary judgment. The court held that Trust Company had failed to verify a forged endorsement and had paid the instrument. Plaintiff had acted negligently in allowing its bookkeeper access to the funds in question. The Appeals Court refused to hold that failure to verify a forged endorsement was not commercially reasonable as a matter of law. For the reasons given in the preceding sections of this order, Fidelity's actions were much more egregious. The court finds that the defendant has failed to produce evidence sufficient to show that it acted in a commercially reasonable manner.

## III. *Duty to Report Unauthorized Signatures*

O.C.G.A. § 11–4–406 provides that if a bank mails to its customer a statement of its account accompanied by the items paid in good faith, or otherwise makes the statements and items paid available for inspection, the customer must examine the items and notify the bank within 60 days of an unauthorized signature or alteration. This statute does not apply to this case because Fidelity never sent any documents concerning these unauthorized accounts to APCOA. Fidelity produced a copy of a letter sent to Fidelity by APCOA which requests that all documents concerning APCOA accounts were to be sent to the Cleveland office. However, all documents on Ison's accounts were sent initially to the Atlanta office then later to a P.O. Box maintained by William Jones.

## CONCLUSION

Plaintiff's motion for Summary Judgment is GRANTED in the amount of $259,-611.85 plus interest.